## JOHNSON v. GRADY COUNTY.

No. 7213.   Opinion Filed June 15, 1915.

On Motion for Rehearing, July 20, 1915.

(150 Pac. 497.)

1.   STATUTES—Enactment—Revenue Law. Chapter 152, Sess. Laws 1910-11, which is a law creating the office of county assessor, providing for his election, qualification, and duties, and having for its general purpose the assessment and equalization of property for taxation, is not a revenue bill.

2.   SAME—"Revenue Bills." "Revenue bills" are those that levy taxes in the strict sense of the word.

3.   SAME—Title of Act—Assessment—Refund of Taxes. Chapter 152, Sess. Laws 1910-11, is an act creating the office of county assessor and for other purposes relative thereto. The last clause in section 14 of said act is as follows: "And if any taxes, so erroneously assessed, shall have been paid, the same shall be a valid charge against the county and shall be refunded by the board of county commissioners and the amount of such refunded taxes, which have been paid over to any municipality, or to the state, shall be deducted from the tax money due the state or such municipality at the next settlement." Held, this clause is in conflict with section 57, art. 5, of the Constitution, in that the title to said act does not disclose that there is a provision in the body of the act for the refund of taxes theretofore erroneously assessed and paid.

4.   TAXATION—Recovery of Taxes Paid—Voluntary Payment. Where a person voluntarily pays taxes to the county or state, however erroneous the assessment may be, the taxes so paid cannot be recovered unless such taxes were paid under mistake of fact, and not of law; it being a condition precedent to the recovery of such taxes that they be paid under protest, compulsion, or duress.

### ON MOTION FOR REHEARING.

5. **STATUTES—Enrolled Bill—Loss—Validity.** The enrolled bill of chapter 34, Sess. Laws 1903, is not to be found in the office of the Secretary of State, the lawful custodian of the same; it having been lost or destroyed. **Held,** that the fact that the enrolled bill cannot be produced does not of itself invalidate the act.

6. **SAME—**Neither the parchment upon which the bill was enrolled nor the writing thereon, constituted the law. The law is an intangible thing. A law, not invalid for some other and different reason, does not become invalid because the written evidence of the same has been lost or destroyed. No power, except the one that brought it into existence, can destroy such a law.

7. **SAME—Evidence of Existence.** (a) Chapter 34, Sess. Laws 1903, appears in that volume under the certificate of the Secretary of the Territory. **Held,** that this fact makes out a **prima facie** case that the enrolled bill of the act was in existence and in his hands at that time. (b) The absence of the enrolled bill from the office of the secretary, unexplained, also makes out a **prima facie** case that no such law was ever in existence. (c) The fact that the secretary has certified to the existence of the enrolled bill under the seal of his office is entitled to much greater weight than the mere negative fact of the nonexistence of the enrolled bill in his office, at this time.

8. **SAME—Published Session Laws.** The appearance of the act in the Session Laws of 1903, duly certified to by the secretary, is such strong presumptive evidence of its existence at that time, that it is decisive unless the journals of the Legislature of that session show affirmatively, clearly, and conclusively that the act in question failed to become a law.

9. **SAME—Journal as Evidence.** The rule obtains in this state that an enrolled bill on file in the office of the Secretary of State imports absolute verity, and the same cannot be impeached by the legislative journals, and, when such an act is called into question, the courts will look to the enrolled bill only. This is the rule where the bill is attacked for some irregularity; but when the very existence of the bill is questioned, based upon the fact that the enrolled bill cannot be produced, the court will look to the journals for the information.

10. **TRIAL—Question for Court.** The existence of a statute cannot be tried as a question of fact, but must be determined as one of law by the court.

11.   **EVIDENCE—Judicial Notice—Statutes.** The courts must take judicial notice of what is, and what is not, the statute law of the state.

12.   **STATUTES—Evidence of Existence—Recognition by Legislature and Officers.** The recognition of chapter 34, Sess. Laws 1903, as a valid law by succeeding Legislatures, and the assessment of property under it from 1903 to 1911, is of strong probative value that the law was valid.

13.   **SAME—Loss of Enrolled Bill.** The facts set out and held to be sufficient to establish the validity of chapter 34, Sess. Laws 1903, notwithstanding the enrolled bill has been lost or destroyed.

14.   **TAXATION—Recovery of Taxes Paid—Duress—Real Property Tax.** A party cannot successfully plead coercion or duress in the payment of a tax on real property.

(Syllabus by Mathews, C.)

*Error from District Court, Grady County;*

*T. P. Clay, Judge.*

Action by E. B. Johnson against Grady County to recover taxes paid. Judgment for the defendant, and plaintiff brings error. Affirmed, and motion for rehearing denied.

Defendant in error will be called "defendant" and plaintiff in error will be called "plaintiff" in this opinion for the sake of convenience.

This suit was instituted in the district court of Grady county, Okla., to recover certain taxes paid to Grady county, Okla., on lands allotted to a citizen of one of the Five Civilized Tribes of Indians, the title to the lands being in the original allottee at the time the taxes were paid, to wit, for the years 1911, 1912, 1913. The defendant filed a general demurrer to plaintiff's petition, and also a special demurrer on the ground that the petition did not state that the taxes were paid under protest or mistake of fact. Plaintiff based his right to recover taxes paid without protest and voluntarily on sec-

tion 14 of the Act of March 25, 1911, c. 152, of the Session Laws of Oklahoma 1910-11. The defendant contended: (1) That section 14 of said act was void as being in conflict with section 57, art. 5, Constitution of Oklahoma, because of the fact that the subject of such section was not expressed in the title to said act; and (2) that the entire Act of March 25, 1911, was void as being in conflict with section 33, art. 5, Constitution of Oklahoma. The court below sustained the demurrer, and plaintiff appealed therefrom. Plaintiff in his brief contends that neither section 14 of the Act of March 25, 1911, nor the entire act of March 25, 1911, is unconstitutional for either of the reasons assigned. Defendant contends that section 14 of said act creates, if constitutional, a new cause of action where none existed before. The plaintiff denies this proposition and asserts the contrary.

*Bond, Melton & Melton,* for plaintiff in error.

*John H. Venable, Allen K. Swan, S. P. Freeling,* Atty. Gen., and *J. H. Miley,* Asst. Atty. Gen., for defendant in error.

Opinion by MATHEWS, C. (after stating the facts as above). Defendant asserts the following three propositions:

"First Proposition. The universal and well-established rule is that taxes voluntarily paid cannot be recovered unless paid through mistake of fact and not of law, provided the mistake of fact was not caused by the taxpayer's own neglect of duty, or unless paid under duress.

"Second Proposition. That part of section 14, c. 152, Session Laws of Oklahoma 1910-11, which provides, 'And if any such taxes so erroneously assessed shall have been

paid, the same shall be a valid charge against the county and shall be refunded by the board of county commissioners, etc.,' is unconstitutional and void for the reason that it is in direct conflict with section 57, art. 5, of the Constitution of the State of Oklahoma, which provides that each act of the Legislature shall contain but one subject, which shall be expressed in its title; for the reason that the subject of section 14 is not expressed in the title to said act, and said act contains more than one subject.

"Third Proposition. That the entire Act of March 25, 1911, c. 152, Session Laws of Oklahoma 1910-11, is unconstitutional, and void for the reason that the same is a revenue bill and was passed in direct violation of section 33, art. 5, of the Constitution, which provides that no revenue bill shall be passed during the five last days of the session of the Legislature."

The plaintiff asserts the following two propositions:

"First Proposition. Section 14 of the Act of the Legislature of March 25, 1911, is not in conflict with section 57, art. 5, of the Constitution, which provides in substance that every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title.

"Second Proposition. The act of March 25, 1911, is not a revenue measure within the meaning of section 33, art. 5, of the Constitution, and is not void because passed within five days of the adjournment of the Legislature."

The proposition thus presented for our consideration is: Conceding the land was nontaxable, can a tax voluntarily paid without protest be recovered from the county or refunded by order of the county commissioners?

In arriving at a decision thereon, the first point to be examined is whether or not the act approved March 25, 1911 (chapter 152, Session Laws 1910-11), is a reve-

nue bill. The defendant attacks the entire act upon the ground that it is an act for raising revenues, and therefore in conflict with section 33, art. 5, of the Constitution, which provides that no revenue bill shall be passed during the last five days of the session of the Legislature, it being conceded by all parties that the act under consideration was passed by the Legislature on the last day of its session, and the trial court sustained the demurrer upon this ground.

It is not necessary to look further than the well-considered and exhaustive case of *Anderson v. Ritterbusch,* 22 Okla. 761, 98 Pac. 1002, by Chief Justice Kane, to answer this point in the negative, because that case settled this one.

In *Anderson v. Ritterbusch, supra,* the court had under consideration an act which provided, in substance, that the board of county commissioners may contract with a person to assist the county officers in the discovery of property not listed for taxation, and provided that all such property not listed should be listed and assessed for each year that it had been omitted and charged with the levy for that year. The validity of the act was questioned upon the ground that it was a revenue bill and had been passed by the Legislature during the last five days of its session, and the court therein said that "revenue bills are those that levy taxes in the strict sense of the word," and that the act there under consideration, being an act for the discovery of property not listed for taxation and providing for the assessment and collecting of taxes thereon, is not a revenue bill. This decision draws clearly the distinction between "bills that levy taxes" and "acts which provide for the assessment of property for taxation."

It is too plain to admit of argument that the act of March 25, 1911, c. 152, Session Laws 1910-11, in no sense has for its object the levy of a tax or the creation of a revenue, but has for its general purpose the assessment and equalization of property for taxation. It only provides for the assessment of property for taxation. For the law providing for the raising of revenue we must look elsewhere. *Cornelius v. State,* 40 Okla. 733, 140 Pac. 1187.

But the ruling of the court will not be disturbed, for we are of the opinion that the second proposition advanced by defendant is sound and sustains the judgment of the lower court.

Chapter. 152, Session Laws of Oklahoma 1910-11, known as the Act of March 25, 1911, is an act creating the office of county assessor, and for other purposes relative thereto. The title to such act is as follows, to wit:

"An act creating the office of county assessor; prescribing his qualifications and duties; providing for his election and appointment; fixing his term of office and compensation; providing for the appointment of deputies and prescribing their qualifications and duties; creating the county board of equalization and prescribing its duties; and providing for appeals from boards of equalization; prescribing certain duties for the county clerk and county excise board; abolishing the offices of township assessor and township board of equalization, and repealing all conflicting laws."

Section 14 thereof is as follows:

"The board of county commissioners of each county may hear and determine allegations of erroneous assessments or mistakes or differences in the description or value of land or other property, at any session of said board, before the taxes shall have been paid, on applica-

tion of any person or persons who shall, by affidavit, show good cause for not having attended the meeting of the county board of equalization, for the purpose of correcting such error, difference or mistakes, and wherein a lot of land or portion thereof, or any other property, has been assessed to any one person, firm or corporation who or which did not own the same, or property exempt from taxation has been assessed, or which has been doubly or erroneously assessed, the board of county commissioners shall have power, and it shall be their duty to correct all such assessments; and if any such taxes so erroneously assessed shall have been paid, the same shall be a valid charge against the county and shall be refunded by the board of county commissioners and the amount of such refunded taxes, which have been paid over to any municipality, or to the state, shall be deducted from the tax money due the state or such municipality at the next settlement."

It is apparent that the last portion of section 14, providing that erroneous tax payments should be a valid charge against the county, was not included or mentioned in the title to said act; that no reference whatever was made to the subject thereof in the title; and that there was nothing whatever in the title which would indicate in the slightest degree that such section would make such a provision, authorizing the refund of taxes already paid and directing the treasurer to withhold the proportional part refunded from money due the state or such municipality at the next settlement.

Section 57, art. 5, of the Constitution, provides:

"Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, * * * except general revenue bills. * * * Provided, that if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to

so much of the law as may not be expressed in the title thereof."

A provision similar to this has been adopted in almost every state in the Union; and it is perfectly clear, and has been universally held, that this provision of the Constitution is mandatory and must be followed, and that no bill shall contain more than one subject, which must be clearly expressed in its title. This provision has been the subject of much discussion by the courts of almost every state in the Union. *Divet v. Richland County,* 8 N. D. 65, 76 N. W. 993; *Kafka v. Wilkinson,* 99 Md. 238, 57 Atl. 617; *Scharf v. Tasker,* 73 Md. 378, 21 Atl. 56; *Ballentyne v. Wickersham,* 75 Ala. 533; *Holcomb v. Rock Island Ry. Co.,* 27 Okla. 667, 112 Pac. 1023; *State v. Cumberland & P. Ry. Co.,* 105 Md. 478, 66 Atl. 458; *State v. Bryan,* 50 Fla. 293, 39 South. 929; *Ex parte Knight,* 52 Fla. 144, 41 South. 786, 120 Am. St. Rep. 191; *State v. Tibbets,* 52 Neb. 228, 71 N. W. 990, 66 Am. St. Rep. 492; *State v. Burlington M. Ry. Co.,* 60 Neb. 741, 84 N. W. 254; *Ives v. Norris,* 13 Neb. 252, 13 N. W. 276; *City of Pond Creek v. Haskell,* 21 Okla. 711, 97 Pac. 338; *County Com'rs v. Pocomoke Bridge Co.,* 109 Md. 1, 71 Atl. 462, 16 Ann. Cas. 874; Black on Interpretation of Laws, c. 6, sec. 76, p. 175; Cooley, Const. Lim. (7th Ed), p. 205.

Black on Interpretation of Laws, c. 6, sec. 76, p. 175, says:

"Where the Constitution of the state provides that each act of the Legislature shall relate to but one subject, which shall be expressed in the title, the effect is to make the title a part of the enactment, so that any provision of the act which lies outside of the title will be rejected by the courts as unconstitutional, if that can be done without destroying the entire law. In this case, it

is very clear that the title may be resorted to as an aid in the interpretation of the statute, and that it will be entitled to greater weight than belongs to it in the absence of the constitutional provision, since it must be presumed that the mind of the Legislature was directed to the title no less than to the provisions of the enacting clause. * * * The constitutional mandate that the subject of every law shall be expressed in its title has given the title of an act a twofold effect. It has added additional force to the title as an indication of legislative intent in aid of the construction of a statute couched in language of doubtful import, and it also operates as a constitutional limitation upon the enacting part of the law. The enacting part of the statute, however, clearly expressed, can have no effect beyond the object expressed and embraced in the title. To maintain any part of such a statute, those portions not embraced within the purview of the title must be rescinded and if the superaddition to the declared object cannot be separated and rejected the entire act must fall."

In the case of *Holcomb v. C., R. I. & P. Ry. Co.*, 27 Okla. 667, 112 Pac. 1023, Chief Justice Dunn, of the Supreme Court of Oklahoma, said:

"This constitutional provision, or one of similar import, is contained in the Constitutions of practically all of the states in the Union, and its purpose and scope has received consideration at the hands of the appellate courts of practically every jurisdiction. Judge Cooley, in his work on Constitutional Limitations (7th Ed., p. 205), says: 'The intent of this provision of the Constitution was to prevent the union, in the same act, of incongruous matters, and of objects having no connection, no relation. And with this it was designed to prevent surprise in legislation, by having matter of one nature embraced in a bill whose title expressed another.' And similar expressions will be found in other reported cases. It may therefore be assumed as settled that the purpose of these

provisions was: First, to prevent hodge-podge or 'log-rolling' legislation; second, to prevent surprise or fraud upon the Legislature by means of provisions in bills of which the titles gave no intimation, and which might therefore be overlooked and carelessly and unintentionally adopted; and, third, to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the objects of legislation that are being considered, in order that they may have an opportunity of being heard thereon, by petition or otherwise, if they shall so desire."

This case involved the validity of an act of the Legislature which fixed the jurisdiction of the county court, compensation of the judge thereof, provided for a clerk in certain counties, providing for a county stenographer, fixing his duties and compensation. Section 3 of the act provided that the county court should have, concurrent with the district court, appellate jurisdiction of judgments of justices of the peace. This was a case which had been appealed from a justice court to the district court of Comanche county, attempting to give the district court jurisdiction under this act. Nothing in the act fixes the jurisdiction of the district court other than this section, and there is nothing in the title to indicate that it fixes the jurisdiction of the district court at all. Justice Dunn held that no appeal could be had to the district court, and further on in the body of the opinion, says:

"The question is now squarely presented, and, after a full consideration of the same, the only conclusion which we deem at all justifiable, under the authorities, is that, even if sufficient in terms, the subject of the concurrent appellate jurisdiction of the district court not being embraced nor expressed in, nor referable to, the title of the act, that reference thereto in section 3 was in viola-

tion of the section of the Constitution above noted and is therefore inoperative and void. It is clear that an act, the title to which simply defined the jurisdiction of the county court, could not embrace within it, within the terms of this constitutional provision, a section fixing the jurisdiction of the district court. It would not be correlative to the subject expressed in the title, nor would it appear to follow as a natural and legitimate complement, and hence it cannot stand."

The case of *City of Pond Creek v. Haskell, supra,* involved the same provision of the Constitution, and in that case the court said:

"Under this clause of the Constitution, the title of a bill may be very general, and need not specify every clause in the statute, it being sufficient if they are all referable and cognate to the subject expressed; and, when the subject is expressed in general terms, everything which is necessary to make a complete enactment in regard to it, or which results as a complement of thought contained in the general expression, is included in and authorized by it. But, if clauses are contained in the act which are not so correlated to the subject expressed in the title as to appear to follow as a natural and legitimate complement, they cannot stand."

Judge Cooley, in his work (6th Ed.), p. 178), says:

"The courts cannot enlarge the scope of the title; they are vested with no dispensing power; the Constitution has made the title the conclusive index to the legislative intent as to what shall have operation; it is no answer to say that the title might have been more comprehensive, if in fact the Legislature has not seen fit to make it so."

Section 14 of the act under consideration, after making provisions for the duties of the county board of equalization with reference to taxes which had been erroneously assessed, but not paid, provides:

"And if any such taxes, so erroneously assessed, shall have been paid, the same shall be a valid charge against the county and shall be refunded by the board of county commissioners, etc."

In the case of *Divet v. Richland County, supra,* the title to the legislative act in question read:

"An act prescribing the mode of making assessments of property, the equalization of and levy  *  *  *  of taxes for all other purposes relative thereto."

Section 88 of such act (Laws 1897 N. D., c. 126), among other things, provided:

"And in cases where taxes have been or may be paid on lands not subject to taxation,  *  *  *  the money so paid and all subsequent taxes, penalties and costs which have been or which may be paid, shall be refunded, with interest at seven per cent. per annum from the date of payment to the person making such payment, his heirs or assigns; and the same shall be refunded out of the county treasury to which such money was paid, etc."

Divet filed suit against Richland county, N. D., for the refund of taxes paid. Judgment was rendered for the defendant county, and the plaintiff appealed. The judgment was affirmed. The opinion of the court and the contention of the defendant were based upon the fact that the statute under which Divet based his suit was unconstitutional and in conflict with the provision of the Constitution which required that each act of the Legislature should contain but one subject, which must be expressed in its title. In that case the court, in passing upon the constitutionality of such section, used the following language:

"We hold that section 88 is unconstitutional, because it is a wide and radical departure from the subject of

the law as that subject is set forth by its title. Eliminating from the title its repealing features, which are entirely irrelevant to the question we are discussing, the title reads, 'An act prescribing the mode of making assessments of property, the equalization of and levy and collection of taxes, and for all other purposes relative thereto.' Section 61 of the state Constitution provides: 'No bill shall embrace more than one subject, which shall be expressed in its title, but a bill which violates this provision shall be invalidated thereby, only as to so much thereof as shall not be so expressed.' Reverting to the title of the statute as above quoted, we discover that it relates to the subject of taxation, and to that alone. In short, it relates to the subject of the assessment of taxes, the equalization of such assessments, and the levy and the collection of the taxes for public revenues, and this to the exclusion of all other matter whatever. The words 'and all other purposes relative thereto,' found in the title; while unnecessary, in our judgment, are nevertheless of plain and obvious meaning. They embody and express notice to all interested parties that the act will embrace other matters not in the terms expresesd in the title, but which other matters are germane to the subject of law as expressed in plain terms in the title of the act. These general words, while wholly unnecessary to the constitutional validity of the title, are nevertheless not at all misleading. These words need not have been added, however, because the Legislature, having clearly indicated the subject of the enactment, * * * were possessed of full constitutional power to place in the body of the law any matter or provision which, by any fair construction, would relate to the subject of the act as stated in the terms of its title. * * * Turning now to section 88 of the statute, we discover that, except in one feature —that authorizing a reassessment in cases where sales made and deeds issued pursuant to this act were adjudged void—the section has nothing whatever to do with either taxation or the public revenue. With the exception stated,

the entire section is devoted to the creation of causes of action in favor of taxpayers and against counties, for which judgment may be obtained for the use of private persons. Instead of being in furtherance of any of the purposes of the act, as such purposes are set out in its title, section 88, with the exception stated, is in direct opposition to all of such purposes. With the exception stated, the section not only has nothing whatever to do with the assessment, levy, or collection of taxes; but, on the contrary, its purpose is to deplete the public treasury of money derived from taxation in the interest of private parties. With the exception stated, we regard the purposes of section 88 as being entirely foreign to the subject of law as expressed in its title, and hence, to that extent, repugnant to the constitutional provision above cited. We concede that this constitutional provision has uniformly received a liberal construction by the courts, and this court has held in another case *(State v. Nomland,* 3 N. D. 427, 57 N. W. 85 [44 Am. St. Rep. 572]), that it should not be construed as to unduly clog or restrict legislation. But in the case cited the following language was also used: 'But we have no duty higher or more sacred than is the duty to preserve in all its integrity every provision of the fundamental law of the state. The provisions of our state Constitution are, by the terms of the instrument itself, declared to be mandatory—mandatory alike both upon the Legislature and upon this court. If the Legislature, in any act, disregard the mandate, it is the duty of the court to nullify the act, and the fact that the abortive legislation may be highly beneficial and salutary in its nature can in no manner control the duty.' In addition to the numerous authorities cited in *State v. Nomland,* we cited the following as cases illustrative of the construction to be given to the constitutional provision we are considering: *Ives v. Norris,* 13 Neb. 252, 13 N. W. 276. In the case at bar the body of the act is broader than its title, and hence it must be annulled in so far as it transcends the title, and is inconsistent there-

with. Am. & Eng. Ency. of Law, p. 232, vol. 23, note 6; *People v. Congdon,* 77 Mich. 351, 43 N. W. 986. * * * The judgment of the trial court will be affirmed."

In that case the act under consideration was a complete revenue and taxation law, containing something over a hundred sections, and repealed all former laws concerning the levy and collection and apportionment of taxes, and the court there held that a section inserted therein, almost identical to the section under consideration in the case at bar, and, too, in a complete revenue law, was not germane to the subject, had nothing whatever to do with either taxation or the public revenue or the equalization of taxes; and that it was devoted to the creation of causes of action in favor of taxpayers and against counties, where none existed before; and that, instead of being in furtherance of the purposes of the act, as set out in the title to said act, it was in direct opposition to such purposes; and that, contrary to the subject, its purpose was to deplete the treasury in the interests of private parties. What can we say of the section now under consideration in this case? The act of March 25, 1911, creates the office of county assessor and county board of equalization and provides for the equalization of taxes and for the method of levying and collecting taxes, and not the refund of taxes. The latter part of section 14 is not germane to the subject, has nothing whatever to do with the equalization of taxes or the public revenue, and the entire latter part of such section is devoted to the creation of causes of action in favor of private persons and against counties where none existed before, and, instead of being in furtherance of the avowed purpose of the bill, is in direct opposition thereto, and seeks to deplete the public treasury in the interest of

private parties. The title does state that the act provides for the equalization of taxes, and so did the title to the act considered in *Divet v. Richland, supra,* and yet it was held that the same provision was not germane to the subject, was foreign thereto, and in direct conflict with the object of the act, and then in this case the provision for the refund of the taxes cannot be said to be germane to the subject of equalization and levy and assessment of taxes; there is no similarity, no relation, no kinship whatever.

The title to chapter 152, Session Laws 1019-11, makes, briefly stated, the following provisions: (1) Creates office of county assessor, (2) prescribes his qualifications and duties, (3) method of election, (4) fixes term of office and compensation, (5) provides for deputies, etc., (6) creates county board of equalization, (7) prescribes its duties, (8) provides appeals from board of equalization, (9) fixes certain duties of county clerk and excise board, (10) abolishes township assessor, (11) and township board of equalization, etc. This does not contain the general provisions contained in the act in *Divet v. Richland, supra,* "and for all other purposes relative thereto," and this omission makes the title to the Oklahoma act very restrictive and very narrow. Under such circumstances, can it be said that there is anywhere in the title any intimation that the act makes provision for the refund of taxes, or makes erroneous tax payments charges against the county?

The constitutional provision contained in the other state Constitutions provides "that each act of the Legislature shall contain but one subject, which shall be expressed in its title," but the Constitution of Oklahoma contains the provision that every act of the Legislature

shall embrace but one subject, which shall be clearly expressed in its title, thus going a step further than the other Constitutions, and using the word "clearly," giving to this provision of the Constitution greater efficacy, greater weight, and greater scope. It is' clear to our minds that the framers of our Constitution desired to go, in their progressive spirit and anxiety to protect their people, a step further; hence the insertion of the word "clearly." This was in all likelihood intended to go toward curing the evils at which this provision in other Constitutions was primarily leveled. The evil at which this provision was leveled is one which is a menace to good government. We think laws in this state, under this provision of the Constitution, should be more carefully scrutinized than if the word "clearly" were omitted. "Clearly," in this instance, must mean visibly, unmistakably, in words of no uncertain meaning, and under this provision there must be no doubt as to the subject of the act as expressed in the title. Webster defines the word "clearly" as "in a clear manner; without obscurity, without obstruction, without entanglement or confusion, without uncertainty." And without doubt this is what is meant by the word "clearly" in our Constitution. Then the title must express the subject of the act "without obscurity, without confusion, and without any uncertainty."

Nowhere in the title to this act is there any reference to the contents of the last clause of section 14. No mention is made in any manner whatsoever that section 14 or any other section provides for the refund of erroneous tax payments, or that the same shall be a valid charge against the county. Not only is the subject of the last clause of section 14 not expressed in the title clearly—

that is, without obscurity, without confusion, or without uncertainty—but, on the other hand, there is not the slightest reference or clue to the contents of the last clause of section 14, in the title to said act; not the slightest suggestion, directly or indirectly, that the act contains any provision for the refund of taxes, or that the same shall be a charge against the county. It is quite true that section 14 does refer to the board of county commissioners and does provide for them to perform certain duties in the correction of erroneous assessments where taxes have not been paid and where complainant shows good cause for not attending the meeting of the board of equalization, and then makes the provision we now complain of. It is true that the title refers to the board of equalization and to its duties, but this is not a reference to the board of county commissioners. And it is true that the board of equalization is composed of the board of county commissioners, but the board of equalization is clearly a separate and distinct body from the board of county commissioners. The board of equalization exists at only one time in the year. Section 11 provides that the board of equalization shall meet the first Monday in June, and when it completes its work at that time it loses its identity as a board of equalization. It is as completely and clearly a separate and distinct board or body as if it were composed of different men from those constituting the board of county commissioners. It is as much separate and apart from the board of county commissioners as two national banks would be separate and distinct from each other, if organized at different times, and perchance should have the same officers and directors. Therefore a reference to the board of equalization in the title is not a reference to the board of county commis-

sioners, and a reference in the title to equalization and levy and assessment of taxes is not, and cannot be said to be, a reference to refund of taxes, or to making the erroneous payments a valid charge against the county.

This provision of the Constitution, as shown by the great weight of authority, was directed at hodge-podge and log-rolling legislation; and was to prevent surprise and fraud in legislation; and was to prevent provisions being inserted in bills not germane to the question under consideration so that no "jokers" could be run over the unsuspecting.

Our Supreme Court, in *City of Pond Creek v. Haskell, supra,* said that under this clause of the Constitution the title of a bill might be very general, and need not specify every clause in the statute; it being sufficient if they are all related and cognate to the subject expressed. Let us see if the provisions of section 14 are related and cognate to the subject expressed. The object of section 14 is to create causes of action in favor of individuals where none existed before. The object of the bill is to create certain offices and provide for the equalization of taxes and for the general method of levying and assessing taxes, and therefore the refund of taxes paid is not related to or cognate to the question of equalization of taxes or the method of levying and collecting taxes. Equalization must occur before the tax is paid. Taxes cannot be equalized after they are paid, for the reason that no one has authority to equalize after payment.

The court then in the same case goes on and says further that, when the subject is expressed in general terms, everything which is necessary to make a complete enactment in regard to it, or which results as a complement of thought contained in the general expression, is

included in and authorized by it. Following this rule, we say that the latter part of section 14 is not only not necessary to make a complete enactment in regard to the subject, but the subject of the latter part of section 14 is wholly foreign to the subject of the act, and is not in any way germane thereto; and not only is it not a complement of thought contained in the general expression, but it is directly repugnant and contrary to the subject of the act, which has for its object the raising of funds with which to run the government, and the creation of offices looking to that end. And the clauses contained in the last part of section 14 are not so correlated to the subject expressed in the title as to appear to follow as a natural and legitimate complement, and therefore that section cannot stand.

The title to the act of March 25, 1911, contains not even the slightest intimation of the matters contained in the last clause of section 14; and the provisions of the last clause of section 14 are sadly out of harmony with the object of the act, which has for its purpose the creation of officers, whose duties are to levy taxes for the support of the government; and this clause in section 14 seeks to deplete the treasury. This clause in section 14 of the act of March 25, 1911, must be declared unconstitutional in the face of all of these authorities in order to uphold the principle upon which the provisions of the Constitution in question is based. *County Com'rs v. Pocomoke Bridge Co., supra; Magemau v. Bell,* 13 Neb. 247, 13 N. W. 277; *State v. Township Committee of Northhampton* (N. J.), 14 Atl. 587; *State v. Burlington & M. Ry. Co.,* 60 Neb. 741, 84 N. W. 254; *State v. Tibbets,* 52 Neb. 228, 71 N. W. 990, 66 Am. St. Rep. 492; *State v. Bryan,* 50 Fla. 293, 39 South. 929; *Ex parte Knight,*

*supra; Kafka v. Wilkinson, supra; Scharf v. Tasker,* 73 Md. 378, 21 Atl. 56.

Nothing short of a legislative provision for that purpose will suffice to enable one to recover taxes paid under similar conditions to those presented in this case. The law upon this subject is well established in this state that where a person voluntarily pays taxes to the county or state, however erroneous the assessment may be, the taxes so paid cannot be recovered from the county or state to which they were paid unless such taxes were paid under mistake of fact and not of law, which mistake of fact was not caused by the taxpayer's own neglect. It is a condition precedent to the recovery of such taxes that they be paid under protest, compulsion, or duress, and none of those conditions appear in this case. *Louisiana Realty Co. v. McAlester,* 25 Okla. 726, 108 Pac. 391; *Pioneer Tel. Co. v. State,* 40 Okla. 417, 138 Pac. 1033; Cooley on Taxation (3d Ed.), pp. 1495-1505; 37 Cyc. 1178 *et seq.*

For the reasons given, the judgment will be affirmed, with costs.

## ON MOTION FOR REHEARING.

The original opinion was rendered on the 15th day of June, 1915, and was for the defendant. Plaintiff has filed a motion for a rehearing herein, upon several grounds, the most serious of which is that article 5, c. 12, Session Laws of 1897, was not repealed by chapter 34, Session Laws 1903, for the alleged reason that the last-named act, which will be referred to as the 1903 law, does not appear to have been signed by the presiding officers of the two Houses of the legislative assembly, or by the Governor, and it follows that, if the 1903 law is

50—8

invalid for that reason, then article 5, c. 12, Session Laws of 1897, which will be referred to as the 1897 law, was still in force until repealed by the Revised Laws of Oklahoma, effective May 16, 1913. This question becomes material for the reason that article 5, sec. 9, c. 12, of the 1897 law, is practically identical with section 14, c. 132, of the Session Laws of 1910-11, which this court, in the original opinion, held to be void for conflict with section 57, art. 5, of the Constitution, and if the 1897 law was still in force, then the county commissioners were therein authorized to refund the taxes as prayed for by plaintiff.

We are unable to discover that the publication of the law of 1897 in Comp. Laws of 1909 can give the 1897 law any potency or effect that it did not have otherwise. Counsel for plaintiff is in error in stating that Comp. Laws of 1909 were compiled under authority of an act of the Legislature of 1907-08, found on page 696, Session Laws 1907-08. The statutes compiled in pursuance of that particular legislation were the "General Statutes of Oklahoma, 1908." The only legislation in reference to the publication of the Compiled Laws of Oklahoma 1909 is in Senate Bill No. 351, Session Laws of 1909, article 7, c. 3, making an appropriation; the part applicable being as follows:

"And for compiling and publishing all laws of the state, of a general nature, including the session laws, of a general nature, of the second Legislature, in one volume, to be known as the Compiled Laws of Oklahoma 1909; and the state printing board is hereby authorized to make a contract for the compiling and publishing of said volume as provided herein."

Pursuant to that provision, a contract was made with the Pipes-Reed Book Company to publish the volume. Honorable Henry G. Snyder was employed by that company to compile, arrange, and index the same. There was no provision of law making that compilation presumptive evidence of the laws therein contained, and Snyder's Statutes have never received any further official recognition by any other legislative enactment.

In the preface to this volume, Mr. Snyder states:

"Throughout his work the editor has been acutely cognizant of the fact that his functions were neither those of a Legislature nor of a Supreme Court."

Further, in the same preface, the compiler declares that the volume prepared by him did not import absolute certainty, but that he had included all doubtful laws therein; his statement thereon being as follows:

"Therefore, where it could with possible show of reason be contended that any act, section or part thereof is in force, such has been inserted. The result is that the book contains numerous provisions which would have been omitted if an absolute discretion could have been exercised. The purpose has been, however, to present for consideration all laws possibly extant. * * * Where records fail to show the existence, in proper or any form, of laws heretofore appearing in printed volumes of the laws, such facts have been appropriately noted. In many instances whole sections, parts of which are obviously no longer in force, have been inserted for the reason that it might be asserted that some part of such section is the law; and for analogous reasons, in at least two instances, whole titles have been thus inserted. Generally, notes have been made of such conditions."

In the said Snyder's Comp. Laws of 1909 (section 1887) appears the following note relative to the insertion of the County Assessor's Act of 1897:

"The following article, appearing in the Session Laws of 1897 as article 5, of chapter 12, under the title, 'An act creating the office of county assessor, and prescribing his duties,' purports to have been repealed by the provision of the L. of 1903, chapter 34, section 1 (page 268). An examination of the enrolled bills for the year 1903, however, discloses that the act does not appear therein as having been signed by either the presiding officers of the houses of the legislative assembly, or by the Governor. The only place the bill can be found in the office of the Secretary of State, is in a bound volume of vetoed bills."

It is apparent, even had he the authority to do so, which he admits he did not have, that he does not presume to decide whether or not the law of 1897 had been repealed; but he inserted it out of the abundance of caution with the note of explanation and left its validity an open question.

If the argument, adduced here upon the part of the plaintiff, that Snyder's Comp. Laws of 1909, having recognized the 1897 Assessor's Act as unrepealed and still the law of the land, has any weight and potency, then the other side might advance the argument to meet it that the General Statutes of 1908 (section 4675), which did have some legal standing (Session Laws 1907-08, p. 696), and the Revised Laws of Oklahoma 1910 (Harris-Day Code), which is the adopted Code and the accepted law of the state, both exclude the County Assessor's Act of 1897, and each contains the Township Act of 1903 (section 8203, Revised Laws 1910).

It appears that the question of the validity of the repeal of the law of 1897, by chapter 34, Session Laws of 1903, has been before this court once before and passed

squarely upon, and that the holding was against plaintiff's contention here.

In the case of *Milam et al. v. Smith-Mauer Bros.*, 38 Okla. 328, 133 Pac. 33, said section 1845, Compiled Laws 1909, was relied on as conferring upon boards of county commissioners the authority to correct erroneous assessments. The court, in the opinion by Chief Justice Hayes, said:

"Counsel for plaintiffs, in the court below and in this court, have cited section 1845, Compiled Laws 1909 (section 9, c. 12, Session Laws 1897), as conferring upon the board of county commissioners authority to make the correction involved in this proceeding, and said section of the statute does authorize the commissioners, upon application of the person injured, to correct the assessment of property, where such property has been assessed to any person who did not own it; but this statute was expressly repealed by section 1, c. 34, Session Laws 1903."

The above-cited case disposes of the question at issue here and makes it unnecessary to pursue the inquiry further; but, inasmuch as it may be contended that, because no reference is made thereto in the above-cited opinion, the court's attention was not called to the fact that the original enrolled bill is not to be found in the Secretary of State's office, and that if the court had been apprised of that fact his ruling might have been different, we deem it advisable to here go into the matter fully.

At the outset, we are met with the fact that the enrolled bill of the Township Assessor's Act of 1903 is not to be found in the office of the Secretary of State, who is the legal custodian of the same, and it has been missing therefrom for several years, having evidently been lost, destroyed, or extracted from his office.

No one will seriously contend, merely because the enrolled bill is not to be found at this time, that that fact itself invalidates the act. The parchment upon which the bill was enrolled was not the law, and neither was the writing on the parchment the law, but simply evidence of the law and nothing else. The law itself is an intangible thing expressing the will of the people acting through the legislators who enacted the law as the duly constituted delegates of the people. A law, not invalid for some other and different reason, is not rendered invalid merely because the written evidence of the same has been lost or destroyed, and no power, except the one that brought it into existence, can destroy such a law or render it invalid. We are quite sure that no one will seriously contend that a law ceases to be the law merely because the enrolled bill cannot be found, and we deem it unnecessary to pursue that inquiry further or to cite authorities, but see *Gardner v. Barney,* 6 Wall. (73 U. S.) 499, 18 L. Ed. 890.

It being admitted that the enrolled bill has been lost or destroyed and is not to be found in the office of the Secretary of State, the inquiry naturally arises, has such an enrolled bill ever been in existence, and, if so, what method of procedure is available to substantiate that fact, and what is the best evidence that it once existed?

The Organic Act of the territory made the Secretary of the Territory the custodian of the laws enacted by the Legislatures. Section 3 of the Organic Act, which was to that effect, provided in part:

"That there shall be a Secretary of said territory. * * * He shall record and preserve all the laws and the proceedings of the legislative assembly hereinafter constituted, and all acts and proceedings of the Governor

in his executive department; he shall transmit one copy of the laws and journal of the legislative assembly, within thirty days after the end of each session thereof, to the President of the United States and to the Secretary of the Interior, and, at the same time, two copies of the laws and journals of the legislative assembly to the Speaker of the House of Representatives and the President of the Senate, for the use of Congress.   *   *   *"

Section 6 of the Organic Act in part provides:

"Every bill which shall have passed the Council and the House of Representatives of said territory shall, before it becomes a law, be presented to the Governor of the territory. If he approves he shall sign it, but if not, he shall return it with his objections to the House in which it originated, which shall enter the objections at large upon its journal and proceed to reconsider it. If after such reconsideration, two-thirds of that House shall agree to pass the bill, it shall be sent, together with the objections, to the other House, by which it shall likewise be reconsidered, and if approved by two-thirds of that House it shall become a law. But in all such cases the vote of both Houses shall be determined by yeas and nays, to be entered on the journal of each House respectively. If any bill shall not be returned by the Governor within five days (Sunday excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the assembly, by adjournment, prevent its return, in which case it shall not be a law."

The Session Laws of 1903, printed under the direction of the said Secretary, contain the following certificate:

"AUTHENTICATION.

"TERRITORY OF OKLAHOMA, OFFICE OF THE SECRETARY OF THE TERRITORY.

"GUTHRIE, O. T.

"I, William Grimes, Secretary of the Territory of Oklahoma, do hereby certify that the printed acts and resolutions contained in this volume are true and correct copies of the enrolled laws and resolutions which were passed at the regular biennial session of the legislative assembly, begun on the 13th day of January, A. D. 1903, and concluded on the 13th day of March, A. D. 1903, as shown by the records of this office; and I further certify that all laws and resolutions contained in this volume, which, by their terms, were to take effect upon their publication, will take effect and be in force from and after the 8th day of April, A. D. 1903; and I further certify that all the laws and resolutions herein contained which, by their terms, were to take effect upon their passage and approval, took effect from and after their respective dates annexed thereto in this volume.

"Given under my hand and seal of this office this 8th day of April, A. D. 1903.

"WILLIAM GRIMES,
"Secretary of Oklahoma Territory [Seal.]"

It might be said that the appearance of the act in the Session Laws of 1903, under the certificate of the Secretary of the Territory, makes a *prima facie* case that the enrolled bill of the act was in his office at the time of the making of the certificate; and, upon the other hand, it might also be contended that the absence of the enrolled bill from the office of the Secretary of State makes out a *prima facie* case that no such law was ever in existence, and we are of the opinion that either, in the absence of the other, would make out a *prima facie* case

for that side.   But it remains to determine, where both exist, as in the case at bar, which shall predominate.

We are of the opinion that the presumption is in favor of the certificate of the Secretary, and the fact that the Secretary has certified to the existence of the law under the seal of his · office is entitled to much greater weight than the mere negative fact of the nonexistence of the enrolled bill in his office at this time, because the bill could easily have been lost, misplaced, or extracted from his office, as no special provisions have been provided to insure its safe-keeping, as these bills are in the office open to the inspection of those who so desire, while the probability of the Secretary certifying to the existence of an enrolled bill which in fact did not exist is so remote as to render it almost wholly improbable.   In fact, the solemn act of making such a certificate by one of the high officers of the territory can but be regarded as record evidence of the highest character, even held by some courts to be conclusive.   *Eld v. Gorham,* 20 Conn. 8; *State v. Wheeler,* 172 Ind. 578, 89 N. E. 1, 19 Ann. Cas. 834.

Notwithstanding the unexplained absence of the enrolled bill from the office of the Secretary, where the statute provides it must be kept, we are constrained to hold that the certificate of the Secretary is such strong presumptive evidence of its existence at the time the certificate was made and actually in his hands, as he so certifies, that it is even decisive unless the journals of the Legislature of that session show affirmatively, clearly, conclusively, and beyond all doubt that the act in question failed to become a law for some reason.   *Railway Co. v. Simons,* 75 Kan. 130, 88 Pac. 551.

When we propose to look into the journals of the two Houses of that session, we encounter some difficulty,

because this court, in a very strong opinion by Justice Hayes in the case of *Atchison, T. & S. F. Ry. Co. v. State,* 28 Okla. 94, 113 Pac. 921, 40 L. R. A. (N. S.) 1, holds that the rule obtains in this state that an enrolled bill, duly filed in the office of the Secretary of State as the law provides, imports absolute verity, and that the same cannot be impeached by the legislative journals, and that it is not competent to show by the journals that the act was not regularly passed, and that, when such an act was called into question, the courts could look to the enrolled bill only. This case follows the unanswerable case of *Field v. Clark,* 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294, by Justice Harlan. To the same effect is *McNeal v. Ritterbusch,* 29 Okla. 223, 116 Pac. 778.

We recognize the reasoning as set out in these cases as sound, but in the case at bar a different question is presented to the one under consideration in the above-cited cases. In each of those cases, the enrolled bills were attacked upon the ground of irregularities in their passage or approval; but in the case at bar, the very existence of the bill itself has been called into question, based upon the fact that the enrolled bill cannot be produced.

Not that there was a failure to conform to some requisite procedure in its passage, or that some act was done, or there was a failure to do some act which was fatal to the validity of the bill, but it is asserted that no such bill was ever brought into existence. We do not believe we transgress the rule laid down in the above-cited cases when we propose to look into the journals to see what light may be there thrown on the question under consideration.

Here it will be observed that, when such matters present themselves, it becomes the duty of the court to

inform itself in the best way that it can and in such manner as in its discretion it may deem best. While it is a question of law, which the court is bound to take notice of, yet here appears the paradox of the court investigating the facts in order to be informed of what the law is. *Sherman v. Storey*, 30 Cal. 259, 89 Am. Dec. 93.

The existence of a statute cannot be tried as a question of fact, but must be determined as one of law by the court. *Division of Howard County*, 15 Kan. 194. If the enrolled bill was in existence, then we would look only to the bill itself and not beyond it, for it imports absolute and conclusive verity; but if it is lost or destroyed, as in the case at bar, then it becomes necessary to look for information to such other documents as in our discretion we may select and reason may dictate. We look first to the printed statute certified to by the proper official as the law provides, and, as stated before, some courts hold that, if the law appears there, we need not look further, as its appearance there is conclusive evidence of its existence (*State v. Wheeler*, 172 Ind. 578, 89 N. E. 1, 19 Ann. Cas. 834), and we are inclined to follow that rule here and find the law to be that the printed volumes of any statute with the proper certificate attached shall be given full faith and credit and are not open to attack under any ordinary condition. It can readily be seen where any other holding would lead us to, if the statutes of our own state can thus be called into question, so can the statutes of other states, and such a status would lead to utter confusion and chaos in the field of law.

So, in the absence of the enrolled bill, when such a question as the one at bar arises, the court should always look to the next best evidence which may be in existence,

which in this case is the printed statute properly certified to.

The next best evidence would be the journals of the two Houses which show the actions of the Legislature when the bill was under consideration, together with any records kept in the Governor's office and in the office of the Secretary of State, and, fully realizing the importance of this case, as large sums of money depend upon our arriving at the correct conclusion, we have made a careful personal investigation of all the records obtainable which in any way relate to the question under consideration.

It will be noted that in Snyder's Comp. Laws of 1909, in the note to the County Assessor's Act, therein contained (page 553), appears the following:

"An examination of the enrolled bills for the year 1903, however, discloses that the act does not appear therein as having been signed either by the presiding officers of the Houses of the legislative assembly, or by the Governor. The only place the bill can be found in the office of the Secretary of State, is in a bound volume of vetoed bills."

It might be inferred from the above that the enrolled bill was to be found in the office of the Secretary of State, but in the condition of not having been signed by the Speaker of the House or President of the Council or approved by the Governor. The facts are, as stated before, that the enrolled bill cannot be found in the office of the Secretary and is either lost or destroyed.

An inspection of the instrument, referred to in this note in Snyder's Statutes, which we find on file in the Secretary's office, discloses without doubt that it is the

engrossed House Bill, which was engrossed in the House and sent to the Council from the House. At the time it was engrossed in long hand, its House history was also written on the first page in the same hand as the other parts of the bill. Its Council history is pasted on the back of the bill, having been written on a separate printed slip of paper. The bill contains many interlineations, written by pencil, and was evidently used by the Council when it had the same under consideration in lieu of printed copies, as its Council history shows that it was passed hurriedly through the Council as it was read the first time on March 2, 1903, and passed that body on March 5th, and returned to the House on the same day. It is true that this instrument is not signed by any one, which fact, in itself, is strong evidence that it is an engrossed bill only for the reason that engrossed bills are never signed, and the document under consideration further discloses that it is an engrossed bill by its having no place on it for the signatures of any one, while an enrolled bill always has blank spaces for the Speaker and President of the Council and Governor to sign.

It will be noted that the law of 1903 has no repealing clause or any clause stating when the bill took effect. The instrument on file in the Secretary's office has both clauses, being numbered 13 and 14. Section 12 of the 1903 law evidently was inserted after the bill was engrossed, as it is written on a typewriter and pasted in the bill immediately before said sections 13 and 14, and these two sections, which were originally numbered 12 and 13, were renumbered after this typewritten section was inserted, and the natural conclusion, from the circumstance of sections 13 and 14 not appearing in the 1903 law, is that when the bill was being enrolled, after its

final passage, the enrolling clerk, after having enrolled section 11, turned back to enroll this typewritten section 12 and then neglected to return to sections 13 and 14. There are many other facts appearing which almost conclusively denote that the instrument is the engrossed bill only.

The official designation of the law of 1903, while it was under consideration by the House and the Council, was "Substitute House Bill No. 5." The following appears in the House Journal of 1903:

"GUTHRIE, OKLAHOMA,
"Saturday March 7th, 1903.   54th Day.
(p. 321)

"Message from the Council:
"TERRITORY OF OKLAHOMA, COUNCIL CHAMBER.
"GUTHRIE, O. T., March 7, 1903.
"Mr. Speaker:   I have the honor of transmitting through you to the House * * * Substitute for H. B. No. 5, which have been signed by Mr. President.

"Very Respectfully,
"VERNON W. WHITING, *Chief Clerk.*

"The Speaker signed * * * Substitute House Bill No. 5, and ordered same transmitted to the Governor (p. 323)."

The following appears in the Council Journal of 1903, p. 304:

"GUTHRIE, OKLAHOMA,
"Saturday, March 7, 1903, 54th Day.

"The President announced his intention of signing * * * Substitute for H. B. No. 5, and hearing no objections the bills were signed. * * *

"GUTHRIE, OKLAHOMA,

"Friday, March 13, 1903, 60th Day.

"Moved by Councilman Blakeney that the Council do now adjourn *sine die.* The motion prevailed and the Council adjourned without day (page 375)."

These excerpts from the journals of the two Houses show that substitute for House Bill No. 5 was signed by the Speaker of the House and President of the Council in open session and ordered transmitted to the Governor. The instrument on file with the Secretary shows not to have been signed by the officer of either House. Further, the engrossed bills have been customarily deposited with the Secretary after the adjournment of each Legislature. and the instrument under consideration has been compared with other engrossed bills of the 1903 session in the Secretary's office, and is quite similar in every particular with the other engrossed bills in his hands. All these facts lead the court to the conclusion that the instrument under consideration is the engrossed copy only of Substitute House Bill No. 5, and not the original enrolled bill.

An inspection of the House and Council Journals of 1903, in their original form, on file in the Secretary's office, has been made, and each shows that Substitute House Bill No. 5 passed through each body in regular order; the journals of the House showing the following action on the bill:

"GUTHRIE, OKLAHOMA,

"Monday, January 19, 1903.

"House Bill No. 5 introduced by Cummins, read first time and passed to second reading (page 13). * * *

"GUTHRIE, OKLAHOMA,
"Tuesday, January 20, 1903.

'House Bill No. 5, by Cummins, entitled 'An act repealing the law relating to county assessor and creating the office of township assessor.' Called up and read second time and referred to Committee on Ways and Means (page 16). * * *

"GUTHRIE, OKLAHOMA,
"Tuesday, February 3, 1903.

"The Ways and Means Committee, by its chairman, Mr. Matthews, made the following report:

"Guthrie, O. T., Feb. 3, 1903. Mr. Speaker: We, the Committee on Ways and Means, recommend that H. B. * * * do pass.    J. L. MATTHEWS, *Chairman.*

"Report adopted on motion by Cummins.

"Mr. Speaker: We, the minority of the Committee on Ways and Means, recommend that House Bill No. 5 do not pass.

"J. W. HARRISON,
"W. P. FRANCIS.

"Motion by Francis that House reconsider action on H. B. No. 5. Point of order by Maxwell, that the maker of the motion voted against the adoption of report of committee on H. B. No. 5. Point of order sustained.

"Motion by Matthews that House reconsider its action in adopting majority report of Committee on Ways and Means on H. B. No. 5. The roll being called on reconsideration of H. B. No. 5, resulted as follows: Ayes 23; nays 2; absent 1. Question being upon adoption of minority report the nays prevailed and minority report lost (pages 67 and 68). * * *

"GUTHRIE, OKLAHOMA,
"Wednesday, February 25, 1903.

"Committee of the Whole by its chairman, Mr. James, reported as follows: Mr. Speaker: The Committee of the Whole having had under consideration Substitute for H. B. No. 5, report progress and ask leave to

sit again.　Report of Committee adopted on motion by Matthews.

"Motion by McTaggart that House do now resolve itself into the Committee of the Whole for the further consideration of Substitute for H. B. No. 5. 　*　*　* The motion prevailed and James called to the Chair (pages 184 and 185).

"The Committee of the Whole, by its chairman, Mr. James, reported:

"Mr. Speaker: ·The Committee of the Whole recommend that Substitute House Bill No. 5 　*　*　* do pass as amended.

"The report of the committee adopted on motion by Ballinger.

"On motion of Cummins Substitute for H. B. No. 5 *　*　* ordered engrossed as amended and placed on third reading and final passage (page 187). 　*　*　*

"GUTHRIE, OKLAHOMA,
"Friday, February 27, 1903. ·

"Cummins asked that Council Bill No. 14 be substituted for Substitute House Bill No. 5.

"Maxwell moved to reconsider the vote by which Substitute H. B. No. 5 was ordered placed on third reading and final passage.　The roll call the motion to lay on the table resulted:　Aye 6, nay 18, absent 2. 　*　*　*

"Substitute House Bill No. 5 read.

"McTaggart moved that the bill do pass.

"The roll call on the final passage of Substitute House Bill No. 5 resulted:　Aye 17, nay 7, absent 2. 　*　*　*

"The Speaker declared the bill passed and the enacting and entitling clauses agreed to (page 202)."

To the same effect appear the Council Journals:

"COUNCIL JOURNAL.

"GUTHRIE, OKLAHOMA,
"Friday, February 27th, 1903, 46th Day.

"The following message was received from the House:

"Mr. President: I have the honor of transmitting through you to the Council House Bills Nos.  *  *  *  5, *  *  *  which passed the House February 27, 1903. Very respectfully, L. D. Bolton, Chief Clerk.  (p. 254.) *  *  *

"GUTHRIE, OKLAHOMA,
"Monday, March 2, 1903.  49th Day.
"Substitute for House Bill No. 5.  By Mr. Cummins. An Act repealing the law creating the office of township assessor.

"Read first time March 2, 1903.

"Read second time March 2, 1903.

"Made special order for March 3, 1903, at 2 o'clock p. m. (p. 258).  *  *  *

"GUTHRIE, OKLAHOMA,
"Tuesday, March 3, 1903.  50th Day.
"Moved by Councilman Foster that Substitute for House Bill No. 5 be substituted for Council Bill No. 14, and take the place of same on the calendar.

"The motion prevailed.  *  *  *

"Moved by Councilman Foster that the rules be suspended and Substitute for H. B. No. 5, read the third time and placed on its final passage.

"The motion prevailed, and substituted for H. B. No. 5, entitled 'An act repealing the law creating the office of county assessor,' or article 5, of chapter 12, of the Acts of 1897, and re-enacting article 2, chapter 80, of the Statutes of 1893, relating to township assessor as herein amended, was read the third time.  The question being, 'Shall the bill pass?'  The roll was called and the vote resulted as follows: Yeas:  *  *  *  5; nays: *  *  *  6.  *  *  *  The bill having failed to receive a majority of the Council was declared lost (pages 267 and 268).

"GUTHRIE, OKLAHOMA,
"Thursday, March 5th, 52d Day.
"Councilman Foster called for a vote on the motion to reconsider the vote by which Substitute House Bill No. 5 was lost.

"The vote was taken and the motion to reconsider prevailed. The question being, 'Shall the bill pass?'

"The roll was called, and the vote on Substitute House Bill No. 5 resulted as follows: Yeas * * * 8; nays: * * * 4. * * *

"The title of the bill was agreed to (page 283)."

The bill is thus traced through both Houses up to the time it was ordered sent to the Governor. We have been unable to find any record evidence of the action of the Governor upon the bill. It will be noted in section 6 of the Organic Act, *supra*, that it is provided that if the Governor approves a bill sent to him he shall sign the same, but if not he shall return it to the House in which it originated, which shall enter the objections upon their journal and proceed to reconsider it. An examination of the journals of each House does not disclose that either House received any message from the Governor concerning this bill, or that either took any further action on the bill whatever which would not occur alone on those bills which receive the approval of the Governor. *State v. Wheeler, supra.* It is important here to note that all bills vetoed by the Governor are returned to the House in which they originated and a record made of that fact, as the Organic Act provided; but an approved bill was always sent to the office of the Secretary of the Territory, who was the legal custodian of the same.

In a book now in the Secretary of State's office labeled "Volume 1, Receiving Book, Secretary of State's Office, Oklahoma Territory," the following entry will be found:

"File No., 6044; Date, March 11, 1903; Time, 4:50; Name, Substitute House Bill No. 5; Character of Instrument, Substitute."

This record of the Secretary thus shows that the bill came to his office.

There appears on file in the office of the Attorney General a letter written to Hon. J. C. Robberts, who was Attorney General of the territory at that time, by Hon. Wm. Grimes, Territorial Secretary, which throws much light on the question of the existence of the enrolled bill and its approval by the Governor. This letter may not rise to the dignity of an official document, yet we believe it to have such a quasi official status that it can be resorted to for information, and as it was written at the very time the effect of this bill was being officially considered, it having been enacted just a few days prior to the writing of the letter, the facts set out in the letter must have been personally and officially known to the Secretary. It will be noted that the Secretary states in the letter that the enrolled bill was signed by the President of the Council and the Speaker and approved by the Governor on the 11th of March. The letter is as follows:

"Wm. Grimes,
"Secretary and Ex Officio Ins. Com.
"J. M. McConnell,
"Assistant Secretary.
"Territory of Oklahoma,
"Secretary's Office, Guthrie.

"March 18th. 1903.

"The Honorable Attorney General, Guthrie, O. T.— Dear Sir: I submit to you Substitute House Bill No. 5, relative to assessors. Numerous inquiries have been received by this office as to contents of the bill. I hereby submit to you the bill as engrossed and also the bill as enrolled. It seems that the enrolled bill, which was signed by the President of the Council and the Speaker of the House and was approved by the Governor on the 11th day of March, had left out sections 13 and 14 of the engrossed

bill. Section 13 of the bill reads 'all acts and parts of acts in conflict with this act are hereby repealed.' Section 14. 'This act shall take effect and be in force from and after the first Monday in January, 1905.' It is evident, from information gained from members of the Legislature, that error has been committed by the enrolling clerk and was not noticed at the time of the signing of the bill and the approval of the same by the President of the Council and the Speaker of the House. The question now arises, and about which numerous inquiries have been made, is the present county assessor legally qualified from the 11th day of March, to proceed with the assessment, or does it become incumbent upon the different townships to finish the work begun by the county assessor? Also, is there any way by which this error could be corrected so as to include the two omitted sections above referred to? There being no time specified in the bill when the same shall take effect, under such circumstances when does, or when did the law go into effect?

"Respectfully,

"WILLIAM GRIMES, *Secretary.*"

Another significant fact we wish to note is that this Substituted House Bill No. 5 was on March 7th ordered transmitted to the Governor for his consideration. Under the Organic Act, unless he returned the same to the House in which it originated within five days, it became a law without his approval. The Legislature finally adjourned on March 13, 1903, and as there is no record in either House of the bill having been returned within the five days, or at any time, it would thus become a law without his signature, and thus the plaintiff can gather no consolation from the fact that we are unable to find any record, other than the communication above from the Secretary to the Attorney General, showing that the Governor actually approved the bill. Further, the law pre-

sumes regularity. This law having appeared in the Session Laws of 1903, with official sanction, every presumption is in favor of its having become a law in the prescribed way, and it is incumbent upon the party attacking its validity to show affirmatively that there is the absence of some necessary requirement that is fatal to the bill. The mere showing of the silence of the record on some necessary requirement is not sufficient, for the law presumes regularity. Other than the absence of the enrolled bill from the office of the Secretary of State, not a single fact affirmatively appears which in any way has the least tendency to discredit the law of 1903, and, as we have said before, the mere absence of the enrolled bill is not sufficient to overcome the presumption of its validity, which arises from its publication under the seal and certificate of the Secretary, which presumption is aided and strongly reinforced by every record extant on the subject and is not discredited by the lack even of a single required record, as we find no law prescribing the keeping of a record in his office of the official acts of the Governor upon legislative bills presented to him.

We deem it unnecessary to pursue the inquiry further, but will here observe that the recognition of the 1903 law within itself carries great weight and is entitled to favorable consideration.

The Legislature at each and every session since 1903 has recognized the validity of this law. The courts have so recognized it. The Constitutional Convention recognized it by not enumerating the office of county assessor as one of the county offices. Property has been assessed from 1903 to 1911 under the law now questioned. Revenues of the state and counties and various municipalities have been collected, based upon assessments made under

the 1903 law. Lands have been sold for delinquent taxes, and deeds executed, pursuant to assessments so made. If the plaintiff can go back to the law of 1897, and by virtue of that law recover taxes paid by him to the county treasurer for the reason that the 1903 law is void, then we answer so can any other citizen of this state who has been assessed under the 1903 law, by a township assessor under the machinery prescribed in the 1903 law, because all of the taxes under such a holding would become illegal, and instead of the plaintiff maintaining an action for some special tax, he might as well maintain it for the total tax paid in for the last eight years just prior to 1911. It can readily be seen what results would follow such a holding as is here urged upon us by the plaintiff, and no court would make a ruling that would have such a calamitous effect unless the law pointed that way in such a clear, convincing, and conclusive manner that no other alternative was open to follow. But in this case we have not been driven to any such extremity, because the law is plainly in favor of the defendant upon every contested point.

We do not desire to abuse our "judicial notice" privilege, but one further point we believe is entitled to consideration, and that is the 1903 law legislated the county assessors out of office, and the law was effective at once, and we are sure that we are well within bounds when we observe that the courts will take judicial notice that all office holders are tenacious in their tenure of the office, and they do not readily retire from an office if there is a remote chance of their holding on, and from this it can be argued that, if the law of 1903 never had a legal existence, then no one would have known that fact better than the county assessors who lost their offices as the

result of the law, and no one would have been quicker to attack the law if it had been susceptible of attack, or even if it had a weak or questionable point, and the fact that the county assessors acquiesced therein and submitted to the law carries with it strong proof that there was not a vulnerable point in the law, and that at that time the enrolled bill itself was on file in the office of the Secretary of State.

As to the second ground raised by plaintiff, relative to the recovery of taxes voluntarily paid, we note the distinction attempted to be drawn between an erroneous tax and an illegal tax; but we see no reason why we should recede from our former holding on this question, as our courts have spoken fully on that particular point and held against plaintiff's contention. See original opinion for authorities. The tax sought to be recovered in this case was paid upon land. It is difficult to see how a person could plead coercion or duress in the payment of such a tax. A tax upon personal property or a franchise might be coerced, but it appears impossible that such a contingency could arise in a land case, and most assuredly no duress, coercion, or even protest has been shown in this case.

For the reasons given, the motion for a rehearing should be denied.

By the Court: It is so ordered.