THE PEOPLE v. GORDON CONGDON ET AL.

*Criminal law—Abduction—Constitutional law—Title of act—Adoption of minor children.*

1. Act No. 26, Laws of 1861 (being chapter 242 of Howell's Statutes), which provides for the adoption of minor children, is plainly in violation of the constitutional provision that the object of an act shall be expressed in its title.

2. How. Stat. § 9099, does not cover a case where the person charged to have been *abducted* (a girl about fourteen years of age), went from this State to Chicago, freely, and out of her natural love for her mother, she having been adopted under the law of Michigan some six years before, since which she had lived with her foster parents; it not appearing that any fraud or duress was used, nor any flattery, allurements, or promises, even, employed, to get the girl away from them, beyond the mere asking if she wanted to go.

Exceptions from Berrien. (O'Hara, J.) Argued October 24, 1889. Decided November 1, 1889.

Respondents were convicted of abduction. Conviction reversed, and respondents discharged. The facts are stated in the opinion.

*C. B. Potter (J. C. Fitz Gerald,* of counsel), for respondents.

*S. V. R. Trowbridge,* Attorney General, *George W. Bridgman,* Prosecuting Attorney (*G. M. Valentine,* of counsel), for the people.

MORSE, J. This is a very singular case, and the result of the trial in the court below is astonishing, and almost incomprehensible. Gordon Congdon is the grandfather and Desire Rosenbach the mother of Lizzie Austin, a girl about 14 years of age at the time of the trial.

Charles Rosenbach is the husband of Desire Rosenbach. The defendants were informed against in the circuit court for the county of Berrien, under the statute, for the abduction of the said Lizzie Austin.

Section 9099, How. Stat., reads as follows:

"Every person who willfully, and without lawful authority, shall forcibly or secretly confine or imprison any other person within this State against his will, or shall forcibly carry or send such person out of this State, or shall forcibly seize or confine, or shall inveigle or kidnap, any other person, with intent either to cause such person to be secretly confined or imprisoned in this State against his will, or in any way held to service against his will, shall be punished by imprisonment in the State prison not more than ten years, or by fine not exceeding one thousand dollars."

The information was filed October 9, 1888, and consisted of three counts.

The first count charged a conspiracy to commit the criminal acts mentioned in the statute.

The second count charges that the respondents, on July 22, 1888, at Benton township,—

" Willfully, and without lawful authority therefor, did forcibly and secretly inveigle and kidnap one Lizzie Austin, with intent to cause the said Lizzie Austin to be secretly confined in the State of Michigan, to wit, at Benton township, in said county, against her will, and to be held to service against her will."

The third count charges that the respondents, on July 22, 1888, at the town of Benton,—

"With force and arms, in and upon one Lizzie Austin, did make an assault, and the said Lizzie Austin then and there, willfully and without lawful authority therefor, and without the consent and against the will of the said Lizzie Austin, did forcibly seize and secretly confine for a long space of time, to wit, for the space of one day, at the township of Benton, in said county, with intent then and there to cause the said Lizzie Austin to be sent out of the State of Michigan, and did then and there, after-

wards, to wit, on the twenty-third day of July, 1888, forcibly send the said Lizzie Austin out of the State of Michigan."

The trial commenced January 22, and closed January 23, 1889.    All three of the respondents were found guilty.

Lizzie Austin was the daughter of John and Desire Lawrence.    When she was eight years old she was adopted by Stephen M. and Kate M. Austin, husband and wife. The proceedings for this adoption were in the probate court, under Act No. 26, Laws of 1861 (How. Stat. § 6379), and the articles of adoption were signed by the Austins and Lawrences, and acknowledged by them.    Lizzie made her mark under the name of Mary E. Lawrence, and it is certified by the notary that she also acknowledged the instrument.    July 9, 1883, the probate court entered its decree, changing the name of the child from Mary E. Lawrence to Mary E. Austin, and declaring her to be the heir at law of said Stephen M. and Kate M. Austin. From that date until about July 22, 1888, she lived with the Austins as their child.    Her mother procured a divorce from her father in the meantime, and remarried and moved to Chicago.    The mother had some correspondence with Mrs. Austin looking towards the restoration of her child to her, but Mrs. Austin wanted $250, which Mrs. Rosenbach thought to be too high.

On Sunday, July 22, 1888, Mr. and Mrs. Rosenbach were staying at the house of one Fleming, in Benton Harbor, at which place the Austins resided.    Congdon, the grandfather, also lived at Benton Harbor.    Saturday night, Lizzie stayed overnight at the residence of a brother of Mrs. Austin.    On her way to the Austins on Sunday she met her grandfather, who told her her mother was at Fleming's and asked her if she did not wish to see her. Lizzie answered, "Yes," and went with her grandfather

77 MICH.—23.

to visit her mother. At Fleming's she also met Mr. Rosenbach. Her mother asked her if she would go to Chicago, and live with them. Lizzie willingly consented. Rosenbach went to get a team; but, being unable to procure one, he and Lizzie traveled on foot into the country towards Three Oaks, a station on the Michigan Central Railroad. They stopped at several farm-houses, seeking a conveyance, and finally found one. A farmer drove them to Three Oaks, where they took a train for Chicago. Lizzie remained at Chicago about a week, when Austin, with a deputy-sheriff of Berrien county, took her forcibly from the custody and care of her mother, and brought her, against her will, to Mrs. Austin's, where she has ever since remained.

Upon the trial, Lizzie, then about 14 years old, was sworn by the prosecution, after they were forced to do so by the demand of the defense and the reluctant ruling of the court that they must obey the law in this respect, and she testified that no force, threats, promises, or other inducements were used by her mother, or any of the respondents, to compel, or even to coax, her to go to Chicago; that she had long wished to leave the Austins, and go to her mother; that she gladly and willingly went; and that if she had her own way she would at the time she was testifying go home with her mother.

No evidence was adduced to show any force used, or any undue means of any kind resorted to, to take this girl away from the Austins "against her will," which is the gist of the offense under the statute, nor was she confined or deprived of her liberty for a moment. It is true, one witness swore that while she was going with her grandfather to Fleming's, to see her mother, Congdon had hold of her arm; but the witness did not notice that the girl was manifesting any unwillingness to go

with him.   All the other testimony in the case is over-
whelmingly to the effect that the child went gladly with her
grandfather to see her mother, as would have been natural;
and that she went willingly, on foot, with her step-
father, until a team was procured to take them to a sta-
tion.

The case seems to have been tried from the beginning
by the prosecution and the court on a wrong theory.
The question submitted to the jury, in effect, was who
had the best right to the custody of the child.   The
court told the jury, in substance, that Mr. and Mrs.
Austin were to be considered the real parents of the
child, and that, while the own mother had a right to see
the child, yet she had no right to seek to estrange the
child from its foster-parents—

"And she must, however hard it may be, have a due
regard for the feelings and rights of the foster-parents,
and, if there should be reason or cause for the child's
being taken away from the care, custody, or control of
the foster-parents, there is another remedy to be pur-
sued.   *   *   *   While we have no law so harsh that it
will forbid the mother to look upon or see her child, and
talk with her,   *   *   *   yet she must, when she so con-
verses with this little girl, have a due regard for the
feelings of the Austins; and she must not have sought to
estrange the love or feelings of that little girl in any way
or particular."

The court also said:

"As to the influence exercised by the defendants, gen-
tlemen, if any, with Lizzie Austin, to create a desire in
her mind to go to Chicago, to live with her mother, I
instructed you this morning, and I now repeat it: In
case you find that there was a consent on the part of
this little girl to go to Chicago,—if she was willing, if
she went of her own free will and accord,—then it
becomes your duty to find a verdict of not guilty.   But
if you find that that consent, even if there was a con-
sent, was brought about by reason of force, or promises,
or anything of that sort; for instance, if these defend-

ants, or any one of them, having in mind a common object, and each of them seeking to carry out that object, had purposely gone to this little girl at the time and place charged or testified to, and, knowing her age, and knowing that what they might say to her might tend to influence one of that age, and have an undue influence upon her,—then, in case they held out any inducement in the way they would clothe her; if they instituted comparisons between the house she then lived in and the home they would give her; if they did this, intending to destroy her love for her foster-parents, or cause her to form an intent or desire to go; if they did anything of that kind,—then they would be guilty.

"If, as I said before, you find that she consented, and that, even though they made inducements, those inducements had nothing to do with her going away, then your duty is to find a verdict of not guilty. You look at the testimony in the case, and it is for you to say whether or not there was undue influence of that kind, with the intent to cause her to leave her foster-parents."

There was no evidence in the case that anything was said to her about how she would be clothed, or what kind of a home her mother would give her, and nothing in the case to warrant this reference in the charge. This was after the jury had been out, and returned for further instructions. A juryman asked:

" Would any influence, under the circumstances, brought to bear upon this little girl by any of the defendants be regarded as undue influence?

" *Court.* No, gentlemen. There might be such a thing as a good influence, as an effort upon their part to influence her for the better or for good; and a bad influence is one such as I have instructed you upon."

Under this charge the jury were justified, if they followed the instructions, in finding the mother guilty of the crime charged, if they found simply that she asked Lizzie to go home with her, and such asking induced her to go. There was no evidence in the case tending to show that any fraud or duress was used, nor any flattery, allurements, or promises, even, employed, to get this girl

away from the Austins, beyond the mere asking if she wanted to go. The record shows that she went gladly and freely, out of her natural love for her mother, and for no other reason. She wants to live with her mother now; and there appears no good reason why she should not do so, except the articles of adoption, and the action of the probate court thereon.

The jury should have been directed, on the facts, to find a verdict of not guilty as to all of the defendants. The statute was not intended to reach a case like this. There is a statute designed to meet cases of this kind, where the child is under 12 years of age (How..Stat. § 9104, as amended by Pub. Acts of 1885, p. 275), and referring especially to adopted children. It punishes the father or mother, as well as any other person, for violation of the statute. But it wisely limits the age of the child to 12 years, recognizing the fact that above that age the wishes of the child have some standing in the courts, as well as its welfare.

The question of the constitutionality of the law under which Lizzie was adopted was argued before this Court in *Morrison v. Sessions' Estate*, 70 Mich. 297 (38 N. W. Rep. 249). It is also again urged upon us in this case. As intimated on the argument, the question was passed in the *Sessions Case*, because not necessary in the determination of the matter there involved; but in this case the rights of the child, Lizzie, as well as of the mother and foster-parents, require that we should pronounce the decision that we arrived at, but did not announce, in the *Sessions Case*. The law is plainly in violation of the constitutional provision that the object of the act shall be expressed in its title. The title of this act, as passed and adopted, is—

"An act to provide for changing the names of minor, adopted children, and of other persons."

There is no reference whatever in the title looking towards, or hinting at, any procedure in the body of the act for adoption, or any declaration that such adoption shall constitute the child an heir at law. The title looks only to a change of name of minor adopted children and other persons, while the body of the act (section 1) provides for articles of adoption of minor children, and a change of name, as an incident of such adoption, to be confirmed by the probate court, and also declaring that—

"The person or persons so adopting such child shall thereupon stand in the place of a parent or parents to such child in law, and be liable to all the duties, and entitled· to all the rights, of parents thereto; and such child shall thereupon become an heir at law of such persons, the same as if he or she were in fact the child of such person or persons."

Section 2 provides for the. changing of the name of an adult person by certain proceedings in the probate court. See *Morrison v. Sessions' Estate*, 70 Mich. 297 (38 N. W. Rep. 250); Laws of 1861, p. 22; How. Stat. §§ 6379, 6380. If the title of this act could possibly be construed so that it could be held to express the adoption of minor children as its object, then the act would be open to the .charge that it violated the Constitution, in that it would embrace more than one object in its title, as the title and act both clearly provide for the changing of the names of adult persons, which is certainly an object entirely different from the adoption of a minor child as heir at law.

It is claimed that the long standing of this law, without question, upon the statute-books, and the probability of many vested rights of long existence under it, should be weighed in its favor, and that it should be saved, if possible. We are dealing now, however, with a case involving present rights of great importance to the parties interested; a case in which this statute has been

made the basis of a criminal proceeding which has resulted in the conviction of three persons who could not have been convicted, even under the instructions of the court below, if this law is invalid. The question also affects the future of the parties, and especially of the girl, Lizzie, who is the ward of the courts. The mandate of the Constitution is plain, as can at once be seen, even by a layman. We cannot hesitate as to obeying it, and in declaring the statute null and void. The Legislature has also taken a step in the same direction, and repealed the act, without any saving clause. See Act No. 171, Laws of 1887, p. 180.

The conviction of the respondents must be set aside, and each of them discharged from further custody or prosecution under the information filed in the court below.

The other Justices concurred.