(49 Misc. Rep. 74)

## MIDDLEWORTH v. ORDWAY et al.

(Supreme Court, Trial Term, Washington County. December, 1905.)

1. ADOPTION—CONTRACT—CONSTRUCTION—RIGHTS AS HEIR.

Where a child was adopted under a contract to feed, clothe, educate, and provide for it, if she should remain with the adopting parents and subject to their government until she arrived at 18 years of age, when she should be entitled to her "dower right to the property" as if she were their own child, it was the intent of the parties that on the performance of the condition she should be entitled to the same interest in her foster father's property as his own lawful child would have had in case of intestacy.

2. SAME.

Where a contract of adoption provided that, if the adopted child should submit to the government of her foster parents until she arrived at 18 years, she should be entitled to the rights of a child in the property of her foster parents, the status as the child of her foster parents began when she arrived at such age, but not the time for the enjoyment of such rights.

3. SAME—EXTENT OF INTEREST.

Where husband adopts a child, with a provision that if she remains with him until she becomes 18 years of age she shall be entitled to the interest of a child in his estate, the contract must be enforced in subordination to the rights of the widow in her husband's estate, which he cannot impair.

Action by Sarah Middleworth against Mary M. Ordway and others for specific performance of a contract of adoption. Judgment for plaintiff.

Erskine C. Rogers, for plaintiff.
Ashley & Williams (Edgar T. Brackett, of counsel), for defendants.

SPENCER, J.   This action is brought by the plaintiff against the widow and next of kin of James M. Ordway, deceased, to compel specific performance of a contract of adoption, dated   November 25, 1879, made by George B. Stanton, her father, with James M. Ordway, the defendant's intestate.

There are few contracts that appeal more strongly to a court of equity than those which provide for the adoption of children.   The one at bar is no exception.   It was made in behalf of the plaintiff, by her father, when she was about 15 months old.   He was a laboring man, in straitened circumstances, who had been left, by the recent death of his wife, with the care of a large family, most of whom were of tender years.   The other party to the contract was a man of mature age, in affluent circumstances, and at the height of an active and prosperous business career.   But his home was childless.   He sought, by the adoption of the plaintiff, to bring into the lives of himself and wife the benefits and pleasures that come from the presence of a healthy, growing child.   It is impossible to mistake the fact that by this arrangement the benefits and obligations were mutual. It was not simply an act of charity; but, even if it were, a man may not freely assume, or be lightly discharged from, the obligations which he takes upon himself when he voluntarily assumes the relation of parent to an infant child.   He may not bring it up in idle luxury, partaking of the pleasure which its infantile sports supply and enjoying the society of its budding youth, and incur no responsibility for its future welfare.   Especially, if a girl, he ought to make such provisions for her as may be in his power.   No reasonable man will disclaim this duty.   If this were not so, the conduct of the priest and Levite, who passed by on the other side, would be a kindness in comparison.   The recent and repeated animadversion of our highest court in cases dealing with contracts for the adoption of infants must not be regarded as having application to the contracts themselves, or as characterizing the adoption of children as a dangerous practice or against public policy, but as directed solely to the tendency to permit the establishment of such contracts by the oral testimony of interested witnesses.   Hamlin v. Stevens, 177 N. Y. 39, 69 N. E. 118; Mahaney v. Carr, 175 N. Y. 454, 67 N. E. 909.   It has laid down a safe principle that, because contracts of this character may be easily fabricated, they must be sustained by the best and most reliable testimony. With this I am in hearty accord.   The introduction of a waif into a family of affluence speaks of the benevolence of the family that receives it; but its long continuance in the home, its treatment by its foster parents, and their well-established declarations as to its status with respect to their property may well support a finding that an agreement existed in that regard.   But this, like all other claims presented against

the estates of deceased persons, must be supported by competent and convincing proof.

Fortunately, the contract in suit is in writing and as to the matter of adoption is reasonably clear. Unfortunately it is somewhat ambiguous in respect to the property rights intended to be conferred. On the trial it was thought necessary to illuminate this part of the agreement by proof of the circumstances attending its execution. This was objected to by the defendants on the ground that whatever ambiguity existed in the agreement was clearly patent and not open to explanation by oral proof. But I think any one who will make a careful examination of the vast number of decisions in this and other states, where the application of the rule as to patent and latent ambiguities has been attempted, will be convinced that, if that rule ever had any justification for its existence, it has long since outlived its usefulness. Without, therefore, attempting to determine whether the ambiguities of the present contract are latent or patent, I am of the opinion that its meaning is not, in some respects, clear and certain, and that the court, in aid of its construction, was justified in receiving oral proof of the circumstances attending its execution. The court must be careful not to vary or contradict its terms in respect to those matters where it is clear and certain, and may only employ the oral proof in determining the meaning of ambiguous terms or terms employed in a local or colloquial sense. It appears, from this evidence, that the contract was made in the county of Hamilton, at a place far remote from the office or residence of a lawyer or of one skilled in legal matters. It was prepared by the general factotum of the neighborhood, a man who acted for his neighbors in the capacity of priest, magistrate, and merchant. He was, however, a man of intelligence and probity, absolutely uninterested, and his testimony may be accepted with the utmost confidence.

Reading the contract in the light of these facts, we should not expect to find all its terms employed in their strict legal sense as established by English precedents. On the contrary, we should expect to find it couched in the local vernacular, made up, as we all know, by a fusion of idioms from different languages. We must therefore give to its words the sense in which they are commonly employed by the people by whom and for whom it was written. Permitted to read the contract thus illuminated, that which otherwise may be meaningless becomes reasonably clear and certain. The important part of the agreement which we are called upon to construe, reads as follows:

"In consideration whereof, the said James M. Ordway and Mary, his wife, does hereby covenant and agree to and with the said George B. Stanton, party of the first part, to adopt the said Sarah as their own child, to feed, clothe, educate, and provide proper care and nourishing when sick as their ability shall allow, provided, always, the said Sarah is to remain with the said James Ordway and Mary, his wife, and submit to their government, until she shall arrive at the age of eighteen years, when she shall be entitled to her dower right to the property of the said James and Mary Ordway, the same as though she were their own legitimate offspring; and the said George B. Stanton, for himself, hereby relinquishes all further claim or control to or in the said Sarah Ordway either in law or equity."

I do not think it difficult to perceive from these provisions that it was the intention of the parties, in case the plaintiff remained with

the Ordways until she arrived at the age of 18 years and submitted to their government, that thereafter she should be regarded as their legitimate offspring and be entitled to the same interest in her foster father's property that a legitimate child would be entitled to in cases of intestacy. If this be a fair construction of the agreement, no serious difficulty stands in the way of its enforcement. Gates v. Gates, 34 App. Div. 608, 54 N. Y. Supp. 454. The case cited was in many respects similar to the one at bar and furnishes a reliable guide for the decision of this court.

It is said that the employment of the word "dower," as descriptive of the interest conferred, is meaningless, as not having reference to any interest which a child may have in the estate of its father, and that therefore no right was conferred. I am of the opinion that such is not the case. The word was not employed in the sense as understood by lawyers, but in its local and colloquial sense, and may have reference to the portion which a daughter receives from her father upon her marriage or upon his death.

The further objection is made that any right which the plaintiff might take under the contract is limited to the time when she arrived at the age of 18 years, and, as no right then accrued, she takes nothing by virtue of the provision. But this does not strike me as having any force. The time was fixed, not with respect to the enforcement of her rights, but as the time when her legal status as the offspring of her foster parents should begin. From thence her status as their child was to continue, and her right in their property was to be determined by the status so established.

But it is said that this contract is unilateral, and therefore void. The defendant cites Gall v. Gall, 64 Hun, 600, 19 N. Y. Supp. 332, Mahaney v. Carr, 175 N. Y. 454, 67 N. E. 903, and Ide v. Brown, 178 N. Y. 26, 70 N. E. 101; but none of these cases has application. In Gall v. Gall, supra, specific performance was not denied because the contract was simply unilateral, but so uncertain that it was not practicable to carry it into effect. In Mahaney v. Carr, supra, specific performance was denied, not because the contract was unilateral, but because the deceased left no property which would in any manner satisfy the terms of the contract. In Ide v. Brown, supra, the contract was also unilateral, but performance was not denied on that ground alone, but because it was made by a guardian for a period which might extend beyond the minority of his ward; and, inasmuch as he had no power to make such a contract, its performance was denied. A careful reading of these cases, together with numerous others of similar character, leaves the impression upon the mind that the courts were constrained in their decisions by the fact that the contracts under consideration were considered inequitable and not supported by satisfactory proof. The harshness of the rule as enforced in Ide v. Brown, supra, does not characterize the general temper and disposition of the courts toward contracts of adoption; and I do not believe that it was intended by that court to in any manner impair the ancient and well-established rule founded in equity that a contract, although unilateral, if in fact performed by the person not bound by its terms, should be enforced against the other party, provided there be no ob-

jection rendering it inequitable.   Parsell v. Stryker, 41 N. Y. 480, 486.

Both parties contend that the agreement gives to the plaintiff the same right in her foster father's personal estate as if she were his legitimate offspring, and that the defendant widow must take, under the statute of distribution, subject to the plaintiff's rights.   This question is not without its difficulties.   It must be conceded that the husband, during his life, might have disposed of his personal property by will or gift, and that the widow would take subject thereto, and therefore the argument comes with great force that his contract with the plaintiff is no more or less than the exercise of the power so residing in him.   It was held in Gates v. Gates, supra, that a child, adopted under the provisions of an agreement similar to this, shared with the other children, thus lessening the part which they otherwise would have received; and, unless the rights of a widow under the statute of distribution may be differentiated from those of a child, the same result must follow.   I am inclined to the view that such a discrimination exists.   The relation of father and child is not in any, sense a contractual one, and the child has no interest in its father's estate growing out of such relation.   The father may therefore multiply by agreement the number of persons who shall stand in the relation of children to him, without regard to the wishes of the children who may be the fruit of his loins.   Such, however, is not the case between husband and wife.   It is not in derogation of that relation to say that it rests upon contract, and that, in most, if not all, instances, is affected by property qualifications.   In some states the wife, immediately upon the marriage, becomes ipso facto the owner of certain specific interests in her husband's estate, both real and personal; and in this state her inchoate right of dower is created by that relation alone.   It is too much to say that the marriage contract is entered into in view of the law which regulates the property rights of the parties and that one party to the contract may not violate the law so as to defeat the rights of the other.   It may be true that the wife assumes the relation subject to the right of her husband to squander his property or to bestow it by gift or will; but that does not include the right on his part to constitute to himself heirs and next of kin in a manner not contemplated by the marriage contract.   In order to recover, the plaintiff must be deemed the child of her foster father.   She takes in the same manner as a child born to him in lawful wedlock.   She takes under the contract of adoption, not by sale, will, or gift, but, to use the language of the contract, "the same as though she were their own legitimate offspring."   The husband may not as to his wife so constitute to himself next of kin and thus deprive the wife of her rights to share in his estate under the statute of distribution.   It is in violation of the marriage contract.

But a further reason exists.   A married man, not lawfully separated from his wife, may not adopt a child without her consent.   Laws 1873, p. 1244, c. 830, § 3; Laws 1896, p. 225, c. 272, § 60.   This provision, no doubt, has reference to an adoption as provided in and by the domestic relation law, of which it forms a part, and therefore may not be regarded as rendering this contract strictly malum prohibitum; it not being an adoption under that statute.   But I am in-

clined to the view that it has that effect as to the defendant widow. Her husband may not accomplish indirectly what he is not permitted to do directly. I therefore regard the contract valid as between the parties thereto, but malum prohibitum as to her, and without effect upon her interest in her husband's estate under the statute of distribution. James M. Ordway left no will, and therefore the enforcement of this contract is in no way brought into conflict with any other disposition of his property made by him.

These views lead to the conclusion that judgment must be entered in behalf of the plaintiff for the specific performance of the contract set up in the complaint, such judgment not to affect the interest of the defendant widow in her husband's estate.

Judgment accordingly.