ROBERTS v. SUTTON.

1. Witnesses—Matters Equally Within Knowledge of Deceased.
    In suit to have plaintiff declared the owner of property of which defendants' decedent died possessed by virtue of agreement to adopt plaintiff when decedent married plaintiff's mother, where all parties to agreement except plaintiff are dead, she may not testify as to the facts equally within knowledge of deceased party whose contract is sought to be enforced (3 Comp. Laws 1929, § 14219).

2. Adoption—Agreement to Adopt—Evidence.
    Agreement by defendants' decedent to adopt plaintiff upon his marriage to plaintiff's mother when plaintiff was five years

of age was inferable from the conduct and statements of the parties thereto and from the facts and circumstances of the case.

3. SAME—AGREEMENT TO ADOPT—INFERENCES.
   If the statements and conduct of the adopting parents are such as to furnish clear and satisfactory proof that an agreement of adoption must have existed, then the agreement may be found as an inference from that evidence.

4. SAME—AGREEMENT TO ADOPT—VOID PROCEEDINGS AFTER MAJORITY.
   Plaintiff *held*, entitled to entire estate of defendants' decedent where evidence showed that he had agreed to adopt plaintiff when he had married her mother, had always treated her as his daughter and she had treated him as her father and performed many valuable services for him without compensation, notwithstanding void proceedings for her adoption after she had attained her majority.

5. SAME—COMMON LAW—DESCENT AND DISTRIBUTION.
   Heirship by adoption is unknown to the common law.

6. SAME—STATUTES—SUBSTANTIAL COMPLIANCE.
   Adoption is purely statutory and there must be substantial compliance therewith to effect adoption.

7. SAME—AGREEMENT TO ADOPT—PUBLIC POLICY.
   Agreements to adopt are not unlawful or against public policy.

Appeal from Livingston; Collins (Joseph H.), J. Submitted January 9, 1947. (Docket No. 40, Calendar No. 43,590.) Decided April 17, 1947.

Bill by Theris L. Roberts against Charles H. Sutton, administrator of the estate of Orra C. Carr, deceased, and others for specific performance of an agreement to adopt. Decree for plaintiff. Defendants appeal. Affirmed.

*Francis J. Shields* and *Shields, Ballard, Jennings & Bishop,* for plaintiff.

*J. B. Munsell, Jr.,* for defendants.

DETHMERS, J. The plaintiff, Theris L. Roberts, was born Theris L. Adams, the daughter of John Quincy and Anna Louise Adams who were divorced

when plaintiff was two years of age. When plaintiff was about five years of age her mother married Doctor Orra C. Carr, a dentist, and took plaintiff with her to live in the home of Doctor Carr, which continued to be plaintiff's home until her marriage at age 26. She assumed the name Theris L. Carr, called the doctor "Father" and "Dad" and showed him the love and devotion of a daughter. Doctor Carr always referred to and introduced her as his daughter. He supported and educated her and showed a genuine affection for her. From the time she was a small child he told others that he was going to adopt her or, in other instances, that he had adopted her. He provided her with a one-year course in dental hygiene at the University of Michigan and thereafter she assisted him in his dental practice on a full-time basis for several years, both before and after her majority, without compensation, and on a part-time basis, also without pay, for several years after her marriage.

When plaintiff was 25 years of age Doctor and Mrs. Carr went to the probate office of Livingston county and executed a declaration of adoption of plaintiff who signed a consent thereto, and an order of adoption was thereupon made and entered by said court. The relationship thereafter continued unchanged, plaintiff still assisting the doctor and treating him as a father; and, upon the death of her mother, plaintiff took care of the doctor, provided meals and in every way evidenced a filial devotion.

While Doctor Carr practiced his profession plaintiff's mother operated a substantial apron manufacturing business. Out of savings from the earnings of both, Doctor Carr and his wife purchased considerable property, which they held by the entireties. Mrs. Carr died in 1943 leaving the doctor as sole owner by survivorship. He told several persons

that all his property was going to plaintiff, that he was leaving it to her for all she had done for him as a daughter and as an assistant in his office and because her mother's money also was invested in their property.

In 1946 Doctor Carr died, intestate, leaving an estate inventoried at almost $25,000. Defendant Sutton is the administrator and the other four defendants, cousins of the doctor, claim that they are the presumptive heirs and entitled to the entire estate, contending that the proceedings for plaintiff's adoption were void because taken after she had attained her majority and that, in consequence, she has no interest in the estate.

Plaintiff has filed her bill of complaint alleging that Doctor Carr took her into his home at the age of five with the agreement and understanding between him and her parents, and later with plaintiff, that he would adopt her. Plaintiff prays that she may be decreed to be the owner of the property of which the doctor died possessed. The trial court held that the adoption proceedings were void but that an agreement to adopt existed. From a decree for plaintiff the defendants have appealed.

For instances in which this Court has upheld a decree for specific performance of an agreement to leave property, at death, to a child who, on the basis of such promise, has been taken into the home and treated as a child of the promisor, see *Wright* v. *Wright,* 99 Mich. 170 (23 L. R. A. 196); *Bassett* v. *American Baptist Publication Society,* 215 Mich. 126 (15 A. L. R. 213); *Jones* v. *Ireland,* 225 Mich. 467; *Lugauer* v. *Husted,* 228 Mich. 76; *Willard* v. *Shekell,* 236 Mich. 197. For cases from other jurisdictions see *Winklemann* v. *Winklemann,* 345 Ill. 566 (178 N. E. 118); *Walsh* v. *Fitzgerald,* 67 S. D. 623 (297 N. W. 675); *Eldred* v. *Glenn* (Mo. App.), 52 S. W. (2d)

35; *Van Dyne* v. *Vreeland,* 11 N. J. Eq. 370; *Fiske* v. *Lawton,* 124 Minn. 85 (144 N. W. 455) and cases cited therein.

With the lips of plaintiff's parents and of Doctor Carr sealed by death, the lips of plaintiff were sealed by the statute.* There is no direct proof of an agreement to adopt in the record. We believe that the trial court properly held that such an agreement may be inferred from the conduct and statements of the parties thereto and from the facts and circumstances of the case.

In the case of *Wright* v. *Wright, supra,* the facts were that the defendant, when about two years of age, was bound out by the superintendents of the poor to one Phineas R. Wright. The latter and his wife, when defendant was nine years of age, filed their petition in probate court declaring their intention to adopt defendant and make him their heir at law, and an order of adoption was entered. Defendant remained in the family until the death of Mr. Wright, performed his duty to his foster parents faithfully and gave them his entire time on the farm without compensation. The statute under which defendant was adopted was held to be unconstitutional. In a suit involving title to the lands of which Phineas R. Wright died seized, the trial court decreed title to be in the defendant. Three of the five judges then composing this Court affirmed the decree. In the opinion for affirmance of Mr. Justice Long, concurred in by Chief Justice McGrath, appears the following:

"The statute under which defendant was adopted was held unconstitutional in *People* v. *Congdon,* 77 Mich. 351. It is apparent, however, that Phineas R. Wright and his wife supposed that defendant's

---

* See 3 Comp. Laws 1929, § 14219 (Stat. Ann. § 27.914).—Reporter.

adoption had been successfully accomplished by the proceedings taken for that purpose. During all these years they treated defendant as their son and heir, and Mr. Wright died in the belief that he would inherit the property the same as an own son would have done. So careful had the parties been to show him their love and affection, that he never knew until after Mr. Wright's death but that they were his own parents. During all these years he had rendered them filial affection, and given them his labor upon the farm, with the belief that at their decease he would inherit all they possessed. *We think there may be said to be a contract,* impliedly at least, that defendant was to have this property, and that there had been such a performance on the part of the defendant as to take the case out of the operation of the statute of frauds. If this arrangement so solemnly made by Mr. and Mrs. Wright cannot be carried out,—*if strangers may now step in and take this inheritance which the defendant has been led to believe would be his,—the defendant would be most outrageously wronged.* He has lived since his adoption upon this farm, in the full belief that he was under his own father's roof, and in the full expectation and belief that, as a son and only child, he would inherit it. It would be technical indeed to say, from all these circumstances, that no contract could be implied which a court of equity would enforce to save the rights of the defendant.''

Mr. Justice GRANT wrote a concurring opinion, in which he said:

''They gave defendant their own name, and by their conduct, language, and treatment represented to him that he was their own son. He lived with them upon this understanding until some time past the age of majority. He had a right to rest and act upon the belief that he was the legal heir. So long as his reputed father and mother chose to let him repose in this belief, others had no right to interfere.

Equity is clearly with the defendant, and, if relief cannot be granted, it must be because the strict rule of law interferes, and permits the accomplishment of an act of the greatest injustice. Unfortunately, the law in regard to adoption was found to be unconstitutional because the real object of the act was not expressed in its title. Each party acted in the undoubted belief that the defendant, upon the death of Mr. Wright, would take the property. *Can equity give validity to such intention, in the absence of express contract? I see no reason why it may not.* Defendant rendered services upon the faith of his relationship. Those services were accepted in reliance upon such relationship, declared in the most solemn manner. * * * *This is a case where, in my judgment, equity should declare that to be done which the parties clearly intended.* I therefore concur in the opinion of my Brother Long."

*In re Firle's Estate,* 197 Minn. 1 (265 N. W. 818), presents a set of circumstances similar to those at bar. The court held that a contract to adopt may be inferred from the conduct of the parties. In affirming a decree awarding the entire estate of decedent to the respondent who claimed by virtue of such agreement, the court said:

"The record does not show a contract to adopt expressed in words, but respondent relies upon a contract as evidenced by the facts surrounding his removal from the Bethany Home of Minneapolis, a home for orphan children, to the home of William Firle and his wife, Mary, the decedent, and the subsequent conduct and admissions of the parties. * * *

"From the time the Firles took the boy they continually referred to him as their son. On many occasions they announced to their friends in Chaska, where they lived for several years, that they had adopted him. He was taken to their church and baptized under the name of William Firle. They

stated to the minister at that time that they had adopted the boy. They were careful not to let him know that he was an adopted child and not their own. William Firle took out a life insurance policy on the boy's life and designated himself in the application as 'father.' They took steps to teach him a trade, and he turned over most of his earnings to his foster parents. * * * He took care of William A. Firle in his last illness and nursed Mary Firle during illness. The record is replete with instances indicating a strong affection between the Firles and respondent.

" 'The introduction of a waif into a family of affluence speaks of the benevolence of the family that receives it; but its long continuance in the home, its treatment by its foster parents, and their well-established declarations as to its status with respect to their property may well support a finding that an agreement existed in that regard.' *Middleworth* v. *Ordway,* 49 Misc. 74 (98 N. Y. Supp. 10, 11).

"The facts set out above all indicate that there was an agreement to adopt respondent. They repeatedly stated that they had adopted him. The evidence all corroborates the existence of a contract to adopt between the Bethany Home and the Firles. We are of the opinion that the status of William as an heir was properly before the probate court and that conduct and admissions expressed a contract which created the relationship of parent and adopted child."

In *Roberts* v. *Roberts,* 138 C. C. A. 102 (223 Fed. 775), decided by the circuit court of appeals, eighth circuit, the plaintiff brought suit to enforce an alleged oral agreement by Charles J. Roberts, deceased, to adopt her as his child and to enforce her rights in his estate pursuant to such agreement. In affirming the decree of the trial court for plaintiff, the court said:

"Upon receiving plaintiff into his family, Mr. Roberts not only gave to her his own name, but the name of his mother. Her foster parents stated repeatedly, both orally and in writing, that they had adopted plaintiff as their child. They treated her as their child. She was baptized in their name. * * *

"The argument by which we are asked to reverse the decree is that there was no direct and clear evidence of an agreement to adopt at the time Myra J. Roberts was received into the family of Charles J. Roberts. There is good reason why such evidence is wanting. All of the parties to the transaction are dead, and Myra J. Roberts was herself a babe at the time of the adoption. It seems to us that in such a case it is not necessary that the court first have direct proof of the making of the contract, and then proceed forward from the contract thus established to the conduct evidencing its existence. We think it is possible to reverse that process, and if the statements and conduct of the adopting parents are such as to furnish clear and satisfactory proof that an agreement of adoption must have existed, then the agreement may be found as an inference from that evidence."

In *Kay* v. *Niehaus*, 298 Mo. 201 (249 S. W. 625), plaintiff sought specific performance of an alleged agreement to adopt her made by decedent in whose estate she sought to share. The proofs showed that decedent had told plaintiff and others that he had adopted her, that he called her his daughter and she called him "father," that the relationship of father and daughter was observed between them and that the plaintiff faithfully discharged the duties of a daughter. Decedent, in the first instance, had taken plaintiff under a contract of apprenticeship, but plaintiff contended that such contract had been abandoned in favor of an agreement to adopt. The court affirmed a judgment for plaintiff and said:

"If a contract to adopt can be shown by admissions, then the judgment *nisi* is correct as to the adoption of plaintiff. As stated, no witness testifies to an oral contract to adopt. All the parties are dead and the lips of plaintiff, if she knew anything, were sealed by the ruling of the trial court. First we have the fact that Niehaus (decedent) did not comply with the contract of apprenticeship, by sending the girl to the public schools, a circumstance tending to show that he was not acting under that contract. His conduct was inconsistent with that contract, but would be consistent with the control of an adopted child. His admissions, so thoroughly shown, justified the trial court to infer a previous contract to adopt. In other words, if a contract to adopt can be shown by acts, conduct and admissions, then the trial court was right. Under our rulings such a contract can be proven in that way."

From the facts and circumstances of the case, the statements and admissions of Doctor Carr, his conduct and that of plaintiff and her mother, an agreement to adopt may be inferred. We are in accord with the trial court's finding of an agreement to adopt plaintiff and that she is entitled to all the property of which Doctor Orra C. Carr died possessed the same as if she had been his sole and only heir at law.

In so holding we are mindful of our decisions in *Albring* v. *Ward*, 137 Mich. 352, *Slattery* v. *Hartford-Connecticut Trust Co.*, 254 Mich. 671, *In re White*, 300 Mich. 378 (138 A. L. R. 1034), *In re Bell's Estate*, 310 Mich. 394 and *In re Garlow's Estate*, 313 Mich. 402, in which we say that heirship by adoption is unknown to the common law, that adoption is purely statutory, having no common-law background, that to accomplish either there must be substantial compliance with the statute pertaining thereto, and that when the statute has not been or

cannot be complied with the adoption will fail. These cases we do not consider applicable here. The distinction is clear. In the instant case the adoption proceedings are concededly void. The question presented is not what effect shall be given to the imperfect adoption proceedings, but, rather, what effect shall be given to the agreement to adopt. We do not hold that plaintiff was adopted, but, rather, that, under the agreement, she ought to have been adopted and that, therefore, with full performance of the agreement on her part, consisting of years of faithful service and filial devotion, she has acquired an equitable interest in the estate of Doctor Carr. A recognition of the validity of this distinction is apparent in the opinion in *Albring* v. *Ward, supra.* We quote from the syllabus:

"Where a statute under which complainant was adopted was unconstitutional, *and there was no contract between her and her foster parents to make complainant their heir,* other than that arising from the adoption proceedings, she was not entitled to share in the real estate of which her foster father died seized."

For an apt discussion of this same subject see, also, *Fiske* v. *Lawton, supra,* in which the court said:

"Respondent contends that 'adoption was unknown at the common law, at least in any sense involving a right of inheritance, and it exists in common-law States only to the extent of and by virtue of statutory enactment and compliance therewith;' further, that the agreement alleged would under no circumstances work an actual adoption or enable the child to inherit from the Herricks, and specifically such follows under the laws of Ohio. For brevity, we will consider these claims collectively. Adoptions were unknown to the common law, but this is of no special significance. Courts of

equity have enforced contracts like the one alleged, whether oral or written, with respect to property rights involved. Such was done in New Jersey, in *Van Dyne* v. *Vreeland,* 11 N. J. Eq. 370, as early as 1857, without statutory authority. This rule has since been followed in many jurisdictions. In *Wright* v. *Wright,* 99 Mich. 170 (23 L. R. A. 196), proceedings were taken to adopt a child pursuant to a statute subsequently declared unconstitutional. Nevertheless, the court, acting on the theory of an executed understanding for adoption and heirship, and the well-established principle that equity should declare that to be done which the parties clearly intended, decreed that title to the real property of the adopting father vested, by reason of the contract, at his decease, in the adopted son, 'the same as if he had been the son.' In *Chehak* v. *Battles,* 133 Iowa, 107 (110 N. W. 330, 8 L. R. A. [N. S.] 1130, 12 Ann. Cas. 140), the same result was reached after an extended review of authorities, where there was an invalid statutory instrument of adoption. In *Winne* v. *Winne,* 166 N. Y. 263 (59 N. E. 832, 82 Am. St. Rep. 647), an agreement by a childless person with plaintiff's mother to make him, an infant, sole heir, was enforced after performance on his part, as to both real and personal property. See, also, *Laird* v. *Vila,* 93 Minn. 45 (100 N. W. 656, 106 Am. St. Rep. 420); *Kleeberg* v. *Schrader,* 69 Minn. 136 (72 N. W. 59); *Grant* v. *Grant,* 63 Conn. 530 (29 Atl. 15, 38 Am. St. Rep. 379); *Lynn* v. *Hockaday,* 162 Mo. 111 (61 S. W. 885, 85 Am. St. Rep. 480); *Albring* v. *Ward,* 137 Mich. 352; *Burns* v. *Smith,* 21 Mont. 251 (53 Pac. 742, 69 Am. St. Rep. 653); *Van Tine* v. *Van Tine* (N. J. Eq.) 15 Atl. 249 (1 L. R. A. 155); *Kofka* v. *Rosicky,* 41 Neb. 328 (59 N. W. 788, 25 L. R. A. 207, 43 Am. St. Rep. 685). The great weight of authority is that such contracts are not unlawful or against public policy. See note, 88 Am. St. Rep. 869. Nor do we find the law otherwise in Ohio. *Clark* v. *Bayer,* 32 Ohio St. 299 (30 Am. Rep. 593), accords

with the views stated. See, also, *Gray* v. *Field*, 19 Wkly. Law Bul. (Ohio) 121. In *Wright* v. *Wright*, *supra*, (99 Mich. 170) it is said the supreme court of Ohio in *Shahan* v. *Swan*, 48 Ohio St. 25 (26 N. E. 222, 29 Am. St. Rep. 517), expressly recognizes the doctrines of *Van Dyne* v. *Vreeland*, *supra*, and kindred cases."

Decree affirmed, with costs to plaintiff.

CARR, C. J., and BUTZEL, BUSHNELL, SHARPE, BOYLES, REID, and NORTH, JJ., concurred.