Martha BLAIR, on Behalf of Barbara BROWN, Plaintiff-Appellant,

v.

Joseph CALIFANO, Secretary of Health, Education and Welfare, Defendant-Appellee.

No. 79–1182.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 8, 1980.

Decided June 5, 1981.

John H. Shepherd, Sommers, Schwartz, Silver & Schwartz, Richard Toth, Southfield, Mich., for plaintiff-appellant.

James K. Robinson, U. S. Atty., Samuel J. Behringer, Jr., David Maurer, Detroit, Mich., for defendant-appellee.

Before EDWARDS, Chief Judge, and LIVELY and ENGEL, Circuit Judges.

EDWARDS, Chief Judge.

This is an unusual appeal from denial of social security benefits. Martha Blair is the grandmother of a child, Barbara Brown, born in 1963. Barbara has lived with her grandmother since infancy and aside from occasional visits with her mother has been entirely supported and cared for by Mrs. Blair and her husband. The Blairs' claim, as advanced in the proceedings before the Secretary of HEW and in the United States District Court for the Eastern District of Michigan, is that under the doctrine of "equitable adoption," Barbara should be regarded as the child of Martha Blair and her husband under 42 U.S.C. § 402(d).

There is no dispute in this case as to the fact that Raymond C. Blair was a wage earner who was entitled to social security disability benefits at the time this application for benefits for Barbara Brown was filed.

The sole issue in this case concerns the application of the following section of the Social Security Act:

> In determining whether an applicant is the child or parent of a fully or currently insured individual for purposes of this subchapter, the Secretary shall apply such law as would be applied in determining the devolution of intestate personal property by the courts of the State in which such insured individual is domiciled at the time such applicant files application, or, if such insured individual is dead, by the courts of the State in which he was domiciled at the time of his death, or, if such insured individual is or was not so domiciled in any State, by the courts of the District of Columbia. Applicants who according to such law would have the same status relative to taking intestate personal property as a child or parent shall be deemed such.

42 U.S.C. § 416(h)(2)(A).

Under this section the parties agree that Michigan law concerning the doctrine of equitable adoption is applicable here and that Michigan recognizes such doctrine. The disagreement hinges on whether or not the doctrine of equitable adoption in Michigan requires proof of economic consideration flowing from the child to the adopting parents generally in the form of services performed by the child.

This case was heard in the first instance by an Administrative Law Judge with appellant unrepresented by counsel. The natural mother did not appear and testify although there was a report concerning her statement that it was understood that the grandparents would raise the child as their own.

In the District Court proceeding, the case was dealt with initially by a Magistrate who recommended either granting benefits or remand for a full factual hearing while appellant was represented by counsel. We adopt the Magistrate's report as the factual posture of this case:

> Barbara Brown was born to Plaintiff's daughter, Judith, and James Brown in October of 1963. When Barbara was two months old, she was taken to live with Plaintiff (her grandmother) and her grandfather because her father refused to take care of her (Tr. 38–39, 88). After being shifted back and forth between her

parents' home and Plaintiff's home, Barbara was permanently left in the Plaintiff's custody at age five months (Tr. 38, 86). At this time, Barbara's parents took their son from Plaintiff's custody, but left Barbara in her care because the father thought it would be "too much trouble to raise two children" (Tr. 86, 39). In 1966, Plaintiff became the legal guardian of Barbara.

Plaintiff and her husband supported Barbara from the time she was five months old until 1972, when Plaintiff's husband became disabled (Tr. 42). Plaintiff has been receiving ADC for Barbara since 1972 (Tr. 42).

The child calls Plaintiff and her husband "Momma" and "Daddy" although she knows that Judith is her natural mother (Tr. 43, 121, 123). Plaintiff enrolled Barbara in school (Tr. 118), had her baptized and enrolled in Sunday School (Tr. 119), and took care of her medical needs (Tr. 120).

The whereabouts of Barbara's father, James Brown, are unknown. He and Barbara's mother are divorced and he is believed to have remarried (Tr. 40). Barbara's mother had two other children by James Brown (Tr. 41). She has not taken Barbara from the Plaintiff's home since the child was five months old. She does not come to visit the child or call her on the telephone (Tr. 100) but she has seen Barbara during the time Barbara has been living with Plaintiff because Judith returns to her parents' home temporarily when she is out of funds (Tr. 48).

Barbara's mother has made statements in the past that would indicate her intent to relinquish her rights to Barbara to her parents. On March 26, 1974, she stated the following to the Social Security Administration:

"It was understood that my father would raise Barbara as his own daughter. I would have no objections to their legal adoption of Barbara, and have told them this many times." (Tr. 88–89).

On March 6, 1975, Barbara's mother sent a letter to Plaintiff which read as follows:

"To Whom It May Concern

My daughter Barbara Rene Brown has been living with my parents since the day she turned five months old. I wouldn't want her to be any place else. As her mother, I give all rights to my parents to adopt my daughter, as she couldn't have a better home, with myself or anyone else." (Tr. 110).

The District Judge did not accept the Magistrate's recommendation to rule in favor of the plaintiff. Instead, he held that the Michigan law of equitable adoption requires "substantial consideration" flowing from the child to the proposed parents in the form of the child's labor and services before an equitable adoption can be recognized. The District Judge relied particularly for this proposition upon *Steward v. Richardson*, 353 F.Supp. 822 (E.D.Mich. 1972), which in turn relied upon *Wright v. Wright*, 99 Mich. 170, 58 N.W. 54 (1894); *Roberts v. Sutton*, 317 Mich. 458, 27 N.W.2d 54 (1947); and *Perry v. Boyce*, 323 Mich. 95, 34 N.W.2d 570 (1948).

Our review of Michigan case law convinces us that *Steward* is an incorrect interpretation of the Michigan law of equitable adoption and that consideration in the form of the child's services is not a prerequisite to an equitable adoption. The emphasis upon filial devotion in Justice Dethmers' opinion for the Michigan court in the *Roberts* case points strongly in this direction. In discussing the estate of plaintiff's stepfather, Justice Dethmers said:

When plaintiff was about five years of age her mother married Doctor Orra C. Carr, a dentist, and took plaintiff with her to live in the home of Doctor Carr, which continued to be plaintiff's home until her marriage at age 26. She assumed the name Theris L. Carr, called the doctor "Father" and "Dad" and showed him the love and devotion of a daughter. Doctor Carr always referred to and introduced her as his daughter. He supported and educated her and showed a genuine affection for her. From the time she was

a small child he told others that he was going to adopt her or, in other instances, that he had adopted her.

317 Mich. at 459–60, 27 N.W.2d 54.

It is true that in the *Roberts* case there was also proof that the plaintiff assisted Dr. Carr in his dental practice without compensation. But, even if the *Roberts* case is read as requiring this economic consideration as essential to an equitable adoption, we do not think that that view would survive the impact of *Wycko v. Gnodtke,* 361 Mich. 331, 105 N.W.2d 118 (1960). The Michigan court rejected a requirement of evidence as to the value of a child's labor to his parents as essential to parental recovery for his wrongful death. The opinion for the court said in part:

> Error, then, there was. But the error into which the court was betrayed was the direct and natural result of this Court's insistence upon the continued employment of the child-labor standard of pecuniary loss. Whatever the situation may have been in 1846, as the children brought home their wages from plant, mine, and mill, today their gainful employment is an arrant fiction and we know it. The trial judge may have been on sound ground as a matter of economics in saying that he didn't think the deceased child had a $14,000 earning capacity. But we are not dealing in economics. We are dealing with a fiction, the fiction that under today's conditions, not those of 1846, the minor child is a breadwinner. He is not. He is an expense. A blessed expense, it is true, but nevertheless an expense. We permit the use of the fiction that he is a wage-earner solely in an effort to accomplish a semblance of justice.

361 Mich. at 341, 105 N.W.2d 118.

While this language was not written in the context of a suit on an implied contract to adopt, it clearly does reflect a different and more modern view of the parent-child relationship than earlier Michigan cases. See also *Jones v. Ireland,* 225 Mich. 467, 196 N.W. 369 (1923).

We recognize that this language has been the subject of bitter and extensive judicial debate in the years since *Wycko* was decided. It was specifically, if narrowly, disavowed in *Breckon v. Franklin Fuel Co.,* 383 Mich. 251, 174 N.W.2d 836 (1970). This led the Michigan legislature in 1971 to amend the wrongful death statute, M.C.L.A. § 600.2922, in effect reversing *Breckon.* Subsequently, the Michigan court, dealing with two cases which arose before the 1971 legislature amendment overruled the *Breckon* case by another narrow majority. *Smith v. City of Detroit,* 388 Mich. 637, 202 N.W.2d 300 (1972). The net effect of *Smith* and the 1971 legislative amendment is the clear vindication of the language we have quoted and relied on in *Wycko.*

There was ample evidence presented before the Administrative Law Judge to establish that Barbara Brown had been abandoned by her father at birth and that her mother had freely and deliberately placed her with Mrs. Blair, her grandmother, and agreed to adoption of her daughter by the Blairs. There is also moving testimony in the administrative record concerning the strength of love and affection between Barbara and Mrs. Blair which we believe under Michigan law would be regarded as substantial consideration to support an implied contract for adoption.

Under these circumstances, we hold that the decision of the Secretary is not based upon an appropriate understanding of Michigan law or upon substantial evidence and that the District Court erred in taking too narrow a view of the applicable Michigan law.

The judgment of the District Court is vacated and the case is remanded to the District Court for a remand to the Secretary for the award of benefits.

ENGEL, Circuit Judge, dissenting.

I respectfully dissent. While the result reached by the majority has much appeal, I am unable to conclude it is a proper application of either the Social Security Act or Michigan law. Title 42 U.S.C. § 416(h)(2)(A) (1976) provides that "the Sec-

retary shall apply such law as would be applied in determining *the devolution of intestate personal property by the courts of the State* in which such insured individual is domiciled at the time such applicant files application . . ." and further provides that "[a]pplicants who *according to such law* would have the same status *relative to taking intestate personal property as a child or parent* shall be deemed such." (Emphasis added). If it had so wished, Congress might have provided that persons entitled under state law to participate in the proceeds of recoveries in tort for wrongful death be eligible for benefits under the dependency provision of the Social Security Act. Plainly, however, it did not do so.

Likewise, I find nothing in Michigan law to suggest that the courts or legislature of that state conceived that they were amending Michigan's laws of intestate succession either in deciding *Wycko v. Gnodtke*, 361 Mich. 331, 105 N.W.2d 118 (1960), or in subsequently incorporating the *Wycko* result into Michigan statutory law in Mich. Comp.Laws § 600.2922 (Supp.1980). Had the Michigan legislature so intended, presumably it could have amended the probate code and the laws of adoption and intestacy at the same time. Again, the legislature has not done so.

The majority's efforts to see in *Roberts v. Sutton*, 317 Mich. 458, 27 N.W.2d 54 (1947), a tendency to alter the laws of intestacy by incorporating concepts akin to those of *in loco parentis* are simply not supported by a plain reading of that case and of the clear line of Michigan authority which preceded it. The recurring theme of those cases, as I read them, is that equitable principles will permit enforcement of a contract to devise or bequeath property or to adopt where otherwise a legal impediment stands in the way where the claimant to the estate has furnished the agreed consideration, either directly or indirectly.

Thus in *Roberts*, the plaintiff was the stepdaughter of the deceased and assisted the deceased in his dental practice for several years both before and after she came of age. During the deceased's last years she took care of him, "provided [his] meals and in every way evidenced a filial devotion." 27 N.W.2d at 54. The legal impediment was that while the doctor had sought to adopt the plaintiff and while in fact an adoption order had actually issued, the order itself was found after the doctor's death to be void. In such circumstances, the Supreme Court of Michigan found an implied contract to adopt frustrated by law but enforceable in equity.

In *Perry v. Boyce*, 323 Mich. 95, 34 N.W.2d 570 (1948), a father-son relationship existed between Perry and MacGregor for many years. In fact, MacGregor had on at least four occasions, by a writing and reaffirmations, specifically sought to make Perry his heir. Those documents, legally ineffective as wills, unmistakably recognized MacGregor's intent to make Perry his heir in consideration for Perry's services. At the age of 14 years, Perry had gone to live with MacGregor. During the depression Perry undertook to sell on the streets and from house to house the flower stands and papers which MacGregor had made, thus providing them both with the necessaries of life during that difficult period. Later, Perry sent MacGregor money while he was in the maritime service. Perry also had purchased property on land contract, made payments on it and had title to it placed in MacGregor's name. The Michigan Supreme Court found specifically that because the several documents signed by MacGregor lacked the formal requisites of wills, "we must hold that Perry was not entitled to take an heir, devisee or legatee . . . ." 34 N.W.2d at 572. Nevertheless, the court found that the authorities cited in *Roberts* were applicable and ruled that "[s]ince the facts and circumstances warrant an inference of an agreement to adopt, Perry, *in absence of any heir at law*, is equitably entitled to all the real and personal property of which MacGregor died possessed, the same as if he had been his actual son." *Id.* (emphasis added).

Underlying all Michigan cases on the issue of equitable adoption is *Wright v. Wright*, 99 Mich. 170, 58 N.W. 54 (1894).

There the defendant was bound out by the superintendent of the poor to the decedent, Wright, at the age of two. When defendant was nine, Wright and his wife sought to adopt him. As in *Roberts v. Sutton, supra,* an adoption order was actually entered, only to be found void later when the adoption statute was held unconstitutional. Defendant remained with the Wrights until the death of decedent and gave them his labor on their farm without compensation. As Justice Long, speaking for the majority, observed:

> During all these years they treated defendant as their son and heir, and Mr. Wright died in the belief that he would inherit the property the same as an own son would have done .... During all these years he had rendered them filial affection, and given them his labor upon the farm, with the belief that at their decease he would inherit all they possessed. *We think there may be said to be a contract,* impliedly at least, that defendant was to have this property, and that there had been such a performance on the part of the defendant as to take the case out of the operation of the statute of frauds.

*Roberts v. Sutton,* 27 N.W.2d at 55–56 (quoting *Wright v. Wright,* 58 N.W. at 55) (emphasis added by Justice Dethmers in *Roberts*).

The foregoing and other Michigan cases are fully and, in my opinion, correctly analyzed by Judge Gubow in *Steward v. Richardson,* 353 F.Supp. 822 (E.D.Mich.1972), which is rejected by the majority here. In my opinion, Judge DeMascio did not err in adhering to this authority when he rejected the position of the magistrate in this case and upheld the final decision of the Secretary.[1]

As in *Steward v. Richardson, supra,* the facts here fall substantially short of those required for an equitable adoption under Michigan law. There has in fact been no adoption here. The mother's permission for the grandparents to adopt was given only after the instant proceedings were begun, suggesting at least the generation of self-serving evidence, motivated more by the prospect of increased social security benefits for the Blairs than by an unqualified desire to have Barbara adopted. When they obtained custody of Barbara in 1966, the Blairs might instead have sought to adopt her. They did not. The relationship between mother, daughter, and granddaughter appears always to have been just that, without any effort to disregard the relationship of mother and daughter existing between Judith and Barbara. Barbara has never used the Blair surname. Barbara called Judith "momma" and the Blairs "grandpa and grandma," which is, of course, exactly what they are. Mrs. Blair encourages the maintenance of a parent-child relationship between Judith and Barbara. Finally, the record is devoid of any evidence that Judith or Barbara tendered any consideration of the type required by the Michigan cases to find an equitable adoption.

As is true of undoubtedly tens of thousands of children of broken homes in the United States, Barbara Blair lives with her grandparents. But, she is a grandchild and not a child. She has a mother still living. Although the Blairs have legal custody of Barbara, that is not the test under the statute. The statutory test is whether, if the grandparents should die intestate, Barbara Blair would be entitled under Michigan law to inherit as a child the intestate personal property of the grandparents even though her mother is still living and would herself be treated as a child of the Blairs

---

1. It might also be argued that an analysis of the Michigan cases and their consistent rationale leave considerable doubt that the Michigan law of equitable adoption is in any way a Michigan "law concerning the devolution of intestate personal property" under the Social Security Act. In reality, it is a law not of intestacy but of contract enforceability in equity *notwithstanding* the laws of intestacy. Such a conclusion need not be reached with any finality, however, since it is apparent to me that the prime requirement of consideration for equitable adoption is not met here.

for the purposes of inheritance.[2] An affirmative response to this test would give rise to a number of enormously difficult issues that the Michigan courts and legislature would then have to resolve. Would the Michigan probate court create for Barbara a share equal to that of her mother and any other children of the Blairs upon whom the intestate property devolves? Or would Barbara take her mother's share, and thus disinherit the latter? Or would Barbara and her mother each take a share per capita with any other children of the Blairs, to the latter's prejudice?

Additionally, the Blairs, as grandparents, were under no legal obligation to support Barbara. The 1957 amendments to Michigan's poor laws relieved grandparents of liability for the support of a dependent child. *See* Mich.Comp.Laws, § 401.2 and § 401.5 (1976), as amended by 1957 Mich. Pub.Acts No. 44, § 1.

The holding of the majority here may represent a socially desirable result, and certainly Congress might in its wisdom broadly extend coverage to dependent grandchildren generally, or to children to whom the eligible wage-earner stands *in loco parentis.* That Congress has chosen the less elastic rules of intestate devolution of personal property would, however, seem to have been a conscious choice to limit this area of coverage. It very well might have been a recognition of the tremendously expensive effect of a broader rule upon the financial stability of the system. It cannot seriously be argued that Congress is without power to attack less than the entire problem. *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). These decisions are up to Congress, not the courts. While I do not suppose that *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), has any viability in this non-diversity action, it makes sense that the statutory command here, as does the judicial command in *Erie,* counsels us to ascertain what the state law is, and not what perhaps it ought to be.

**2.** The Michigan statute concerning the distribution of personal property is compiled in Mich.

I would affirm the judgment of the district court and uphold the Secretary's decision.